08 CV 4441

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

BIVONA & COHEN, P.C. and
JOSEPH V. FIGLIOLO,

                                    Plaintiffs,

                                                                    08 Civ. _____

        – against –                                         NOTICE OF REMOVAL

RECEIVED
MAY 12 2008
U.S.D.C. S.D. N.Y.
CASHIERS

WINDY RICHARDS aka WINDY OGANDO,                New York County
                                                                    Index No. 08/105583

                                    Defendant.

------------------------------------------------------------x

TO:    The United States District Court for the Southern District of New York

                PLEASE TAKE NOTICE that the defendant Windy Richards, by her undersigned

counsel Emery Celli Brinckerhoff & Abady LLP, respectfully notices removal of this action from

the Supreme Court of the State of New York, County of New York, to the United States District

Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1441 and 1446.  As

grounds for removal, defendant respectfully states:

**Introduction**

        1.      This Notice of Removal arises out of the retaliatory legal tactics deployed

by a New York City law firm, Bivona & Cohen PC ("Bivona" or "the law firm") and its senior

law partner, Joseph Figliolo, against a legal secretary at the law firm, defendant Windy Richards.

        2.      Ms. Richards, a 37 year-old single mother of three children, has been

employed at Bivona since August 2007.  Throughout her employment at the law firm, Ms.

Richards was subjected to a relentless, cruel, predatory, and extreme campaign of sexual

harassment and inappropriate conduct by senior partner Mr. Figliolo. Bivona did nothing to discourage or discipline Mr. Figliolo or curtail his overt misconduct. Unchecked, Mr. Figliolo's unlawful behavior persisted. On November 16, 2007, Mr. Figliolo sexually assaulted and raped Ms. Richards in the office during work hours.

3.     After Ms. Richards reported the sexual assault, retained counsel and threatened legal action, Mr. Figliolo and his law firm filed this baseless "preemptive" declaratory judgment action. In this case, Figliolo and Bivona primarily seek a judgment declaring that they have not violated Ms. Richards' rights under federal, state and local anti-discrimination laws. For good measure, Figliolo and Bivona also assert a variety of dubious tort claims such as "prima facie tort."

4.     The aim of this action is transparent: to retaliate against Ms. Richards for reporting Figliolo's rape and sexual harassment; to intimidate Ms. Richards into silence and/or retraction of her truthful charges, and to chill other law firm employees who dare tell the truth in support of Ms. Richards. Not content with "only" raping, harassing and abusing Ms. Richards, Figliolo and Bivona are bent on victimizing her a second time by filing this frivolous retaliatory action.

5.     By filing an anticipatory declaratory judgment action in state court, Figliolo and Bivona also seek to avoid the natural plaintiff's preferred forum for resolving her federal claims. This Court, not state court, is the proper forum. Figliolo and Bivona seek a judgment declaring that they did not violate the rights that Ms. Richards asserted in her letter threatening legal action, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). These are federal claims. And although Figliolo and Bivona have pleaded

their claims so as to partially disguise their federal nature, it remains apparent that their claims belong in federal court.

6.    Because Figliolo and Bivona seek a declaratory judgment under federal law, this Court has jurisdiction and thus Ms. Richards has the right to remove under 42 U.S.C. § 1441. Moreover, Ms. Richards has commenced an action against the Figliolo, Bivona and others in this Court, under Title VII, as well as other federal, state and local anti-discrimination laws. This removed preemptive state court action and Ms. Richards's pending federal court case should be consolidated before a single United States District Judge.

**The Preemptive State Court Action Against Ms. Richards**

7.    On April 22, 2008, Ms. Richards was served with a copy of a Complaint dated April 18, 2002 ("the Complaint). A copy of the Complaint is attached hereto as Exhibit 1. By this Complaint, plaintiffs Bivona & Cohen, P.C. and Joseph V. Figliolo commenced an action against Ms. Richards in the Supreme Court of the State of New York, County of New York, Index No. 08/105583 ("the State Court Action").

8.    In their Complaint, Figliolo and Bivona assert that they have sued Ms. Richards (the sole defendant), a legal secretary currently employed by the law firm, in response to an alleged "extortion scheme." Ex. 1, ¶ 1. According to Figliolo and Bivona, this "extortion scheme" arises out Ms. Richards' complaint (to her own lawyers and her support network, and through her counsel, to counsel for the law firm of Bivona & Cohen P.C.) that she was subjected to severe and pervasive sexual harassment, and that Figliolo raped her in the workplace on November 16, 2007. The Complaint alleges six causes of action against Ms. Richards: two causes of action for declaratory judgment, along with affirmative claims for prima facie tort,

tortious interference with prospective business relations, defamation and intentional infliction of emotional distress.

9.　In the First Cause of Action for "Declaratory Judgment," Figliolo and Bivona seek "a declaration pursuant to CPLR 3001 that Plaintiffs did not violate the State Human Rights law, the City Human Rights Law *or any other applicable law*." Ex. 1, ¶ 33 (emphasis supplied).

10.　In the Second Cause of Action for "Declaratory Judgment," plaintiff Bivona & Cohen seeks "a declaration pursuant to CPLR 3001 that any decision to discipline or terminate Richards is neither discriminatory nor retaliatory in nature, and does not violate the State Human Rights Law *or any other applicable law*." Ex. 1, ¶ 38 (emphasis supplied).

11.　In the Complaint's "WHEREFORE" clause for relief, Figliolo and Bivona seek a judgment in their favor and against Ms. Richards "[d]eclaring that any decision to discipline or terminate Richards is neither discriminatory nor retaliatory in nature, and does not violate the State Human Rights Law *or any other applicable law*;" and "[d]eclaring that Plaintiffs have no liability to Richards under the State Human Rights Law, the City Human Rights Law *or any other applicable law*." Ex. 1, ¶ 60(c) and (d) (emphasis supplied).

12.　Figliolo and Bivona seek a declaratory judgment that their conduct against Ms. Richards did not violate federal law, and specifically, did not violate Title VII. Other than the New York City and New York State Human Rights laws, Title VII is the only "other applicable law" that could apply to Ms. Richards's claims of sexual harassment, sexual assault, discrimination and retaliation in the law firm's workplace.

**The Retaliatory and Chilling Purpose of the Preemptive State Court Action**

13.     Figliolo and Bivona commenced the State Court Action several weeks after they received notice from Ms. Richards, via a letter from her counsel dated March 26, 2008, that she intended to file suit against them based on the discriminatory workplace harassment she suffered and the November 16, 2007 sexual assault (the "Letter"). A copy of the Letter is attached as Exhibit 2. Given the chronology, it is plain that the State Court Action is a cynical tactical maneuver designed to punish and intimidate Ms. Richards and to preempt her from filing an employment discrimination action against them in the forum of her choosing.

14.     The Letter detailed Ms. Richards' complaints that Figliolo had sexually harassed her in the workplace and ultimately raped her in the office during work hours on November 16, 2007. The Letter explained how Figliolo, a 60 year-old senior supervising partner at the law firm, had subjected Ms. Richards to a predatory campaign of sexual harassment and inappropriate conduct, and how Figliolo repeatedly made lewd sexual remarks and unwanted advances to Ms. Richards. The Letter explained how Figliolo's despicable behavior was consistent with his widely known and tolerated pattern of inappropriate conduct towards subordinate female employees at the law firm, including physical contact and touching.

15.     The Letter described in detail Figliolo's sexual assault of Ms. Richards on November 16, 2007, in his office, at approximately 2:00 P.M. on a Friday afternoon. The Letter asserted that the law firm had done nothing to discourage Figliolo or curtail his glaring misconduct, and indeed had promoted a sexually charged and offensive atmosphere in the workplace.

16.     The Letter explained that Bivona had failed to follow the most basic

protocols after the rape occurred and Ms. Richards reported it to other law firm personnel and asserted that both Figliolo, the members of the law firm and the law firm itself were liable for this shocking and damaging behavior. The Letter concluded that "Ms. Richards has obvious claims against the firm arising out of federal, state and local anti-discrimination and human rights laws," and that counsel for Figlilolo and the law firm should contact counsel for Ms. Richards promptly if they had any interest in resolving this without resort to formal proceedings.

17.    Rather than address her serious allegations, Figliolo and Bivona feigned interest in a dialogue with Ms. Richards, including insisting that Ms. Richards make a specific monetary demand. Once Ms. Richards responded (through her counsel) with the requested monetary demand, Bivona and Figliolo raced Ms. Richards to the courthouse steps and claimed extortion. They filed this State Court Action on April 22, 2008.

18.    Figliolo and Bivona are represented by counsel, Ronald M. Green of Epstein Becker & Green, P.C., who touts himself for having "pioneered the use of preemptive litigation in suing current and former employees . . ." Attached as Exhibit 3 is a copy of Mr. Green's profile on his firm's website stating the same. Attached as Exhibit 4 is an article from the New York Law Journal dated April 25, 2008 regarding the preemptive suit. *Id.* ("A New York law firm has filed a pre-emptive suit against a secretary who it claims is demanding $9 million to drop what it says are false rape and sexual harassment charges against a partner. Pre-emptive suits in such cases are relatively rare and frequently controversial, but the tactic is a familiar one for the lawyer representing Bivona & Cohen.").

**Ms. Richards Has Commenced A Federal Action Against Bivona And Figliolo**

19.    On May 1, 2008, Ms. Richards filed a Charge of Discrimination with the

Equal Employment Opportunity Commission ("EEOC"). A copy of the EEOC Charge is attached as Exhibit 5.

20. On May 9, 2008, Ms. Richards received a "Right to Sue" letter from the EEOC. A copy of the EEOC "Right to Sue" letter is attached as Exhibit 6.

21. On May 12, 2008, Ms. Richards commenced an action against defendants Bivona & Cohen, P.C. and Joseph V. Figliolo in the United States District Court for the Southern District of New York, Docket No. 08 Civ. 04433 (CM)(GWG). A copy of Ms. Richards's federal complaint is attached as Exhibit 7.

**The Law Firm and Mr. Figliolo Assert Federal Claims In Their State Court Action, Claims That Belong in Federal Court**

22. Figliolo and Bivona have attempted to artfully plead their Complaint to avoid mention of federal law or Title VII. *See, e.g.,* First and Second Causes of Action of the Complaint, Ex. 1, ¶¶ 33, 38 (seeking a declaration that plaintiffs' conduct did not violate the State and/or City Human Rights laws "or *any other applicable law*") (emphasis supplied). But the gravamen of plaintiffs' claims for declaratory judgment is to seek a declaration and final judgment that Figliolo and the law firm did not violate Title VII or federal law.

23. That plaintiffs are bringing federal claims for a declaratory judgment under Title VII is evident from the Complaint alone. In addition, the State Court Action was specifically and solely commenced on April 22, 2008 because Ms. Richards had previously informed the law firm and Mr. Figliolo (on March 26, 2008) that *she intended to bring federal claims against them for discrimination and harassment.* Ex. 1, ¶ 24 (Richards's counsel stated that Richards is prepared to bring an action to enforce her rights under "federal, state and local

-7-

anti-discrimination laws."). Thus, the fact that plaintiffs seek a declaratory judgment making clear that their conduct was and is lawful under federal law, only after Ms. Richards alleged that they had violated her federal rights, is not in dispute.

24.    By using misleading allegations (*i.e.*, "any other applicable law"), plaintiffs evidently seek to circumvent federal court jurisdiction. But plaintiffs elected to include federal claims in their Complaint. The real nature of plaintiffs' First and Second Causes of Action is to seek a declaration that their conduct against Ms. Richards did not violate Title VII. However styled in the Complaint, this is a federal claim and it belongs in federal court.

25.    Since the Complaint states a federal claim under Title VII, removal to federal court is proper and the district court has original jurisdiction over the action pursuant to 28 U.S.C. § 1331.

26.    Plaintiffs' claims in the First and Second Causes of Action of the Complaint, seeking a declaratory judgment that their conduct did not violate federal law (and Title VII in particular), are within the jurisdiction conferred by 28 U.S.C. § 1331 and renders the State Court Action removable to this Court under the provisions of 28 U.S.C. § 1441(c) without regard to the amount in controversy or the citizenship of the parties.

27.    This Court may exercise supplemental jurisdiction over the related common law claims in the Complaint (for prima facie tort, tortious interference with prospective business relations, defamation and intentional infliction of emotional distress) pursuant to 28 U.S.C. § 1367, as the common law claims alleged are related to plaintiffs' federal Title VII claim by subject matter (the sexual harassment, sexual assault and reporting thereof), time period and/or alleged action.

28.     Pursuant to 28 U.S.C. § 1441(a), defendant Windy Richards has the right to remove this case from the Supreme Court, State of New York, County of New York, to this Court, because the District Court for the Southern District of New York is the District embracing the place where the State Court Action is pending.

29.     This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446 of the Federal Rules of Civil Procedure, within thirty (30) days of defendant's receipt, through service or otherwise, of a copy of plaintiffs' Complaint setting forth the claims for relief upon which this action is based.

30.     Promptly after filing this Notice of Removal, a true copy of this Notice will be filed with the Clerk of the Supreme Court, State of New York, County of New York.

31.     Written notice of the filing of the Notice of Removal will be given to all adverse parties pursuant to 28 U.S.C. § 1446(d).

32.     By filing this Notice of Removal, defendant Windy Richards does not waive any defense which may be available to her, nor does she waive any rights to appeal.

WHEREFORE, defendant Windy Richards respectfully prays that this action proceed in this Court as a matter properly removed to this Court, and that this action be consolidated with Ms. Richards's pending federal court action, Docket No. 08 Civ. 04433 (CM)(GWG), before a single United States District Judge in this Court.

Dated: May 12, 2008
     New York

        EMERY CELLI BRINCKERHOFF
         & ABADY LLP

     By: _____
        Jonathan S. Abady (JA 5147)
        Mariann Meier Wang (MW 7417)
        Matthew D. Brinckerhoff (MB 3552)
        Katherine Rosenfeld (KR 8525)

     75 Rockefeller Plaza, 20th Floor
     New York, New York 10019
     Tel.: (212) 763-5000

     JOSEPH & HERZFELD LLP
     757 Third Avenue, 25th Floor
     New York, New York 10017
     Tel.: (212) 688-5640

     *Attorneys for Defendant Windy Richards*

To:    EPSTEIN BECKER & GREEN, P.C.
       Ronald S. Green
       250 Park Avenue
       New York, New York 10177-1211
       (212) 351-4500

       KAUFMAN BORGEEST & RYAN LLP
       Joan M. Gilbride
       99 Park Avenue
       New York, New York 10016

       *Attorneys for Plaintiffs*

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------ x

BIVONA & COHEN, P.C. and JOSEPH V. FIGLIOLO, :     Index No. 105583 /08

                Plaintiffs,      :

          - against -         :     **COMPLAINT**

WINDY RICHARDS a/k/a WENDY OGANDO,  :

                :

            Defendant.     :

------------------------------------------ x

        Plaintiffs BIVONA & COHEN, P.C. ("Bivona & Cohen" or "the Firm") and JOSEPH V.

FIGLIOLO ("Figliolo") (collectively, "Plaintiffs") by their attorneys, Epstein Becker & Green,

P.C. and Kaufman Borgeest & Ryan LLP, as and for their Complaint against WINDY

RICHARDS, a/k/a WENDY OGANDO ("Richards" or "Defendant") allege as follows:

### NATURE OF THE ACTION

      1.    This action responds to Richards' extortion scheme. Richards, a recently hired

secretary at the law firm of Bivona & Cohen, demands Nine Million Dollars ($9 million) from

Plaintiffs in return for not going public with scandalous and scurrilous claims based on the

alleged rape and sexual harassment of Richards by Figliolo, a partner at the Firm, who is

married. There was no rape or sexual harassment. Defendant's claims are false and are

intended to publicly sully the reputations of an established successful law firm and a partner in

the Firm if her unlawful demand is not met. Her demand is a scheme by a convicted drug felon,

who lied to conceal her criminal background in order to be hired, to obtain money by falsely

claiming that Figliolo raped her, although she enticed him into allowing her to give him a "lap

dance" in his office on the afternoon of Friday, November 16, 2007 causing him to ejaculate into his underwear while he was wearing his underwear and pants. Indeed, Richards soon thereafter proudly displayed to her co-workers the towel Figliolo used to clean up with, and then took the towel home with her, never claiming she was raped. Richards did not complain to the Firm she was raped until February 12, 2008, some three months later, when she raised her allegations for the first time after being summoned to a meeting with the Firm's office manager after a number of days of unexplained absences following repeated warnings about her absenteeism. The nature of Defendant's threats have left Plaintiffs with no choice but to seek affirmative judicial action and relief, including a declaration that her threatened claims under the "state and local anti-discrimination and human rights laws" have no factual and legal merit.

### THE PARTIES

2.    Plaintiff Bivona & Cohen is a professional corporation duly organized under the laws of the State of New York, and maintains its principal place of business in the City, County and State of New York. Bivona & Cohen is a law firm principally engaged in general civil litigation and trial practice.

3.    Founded in 1974, the Firm has 38 attorneys working for it in its New York office and employs 44 support staff members.

4.    Plaintiff Figliolo is an Equity Partner of Bivona & Cohen. He resides in New York County in the State of New York.

5.    Figliolo, a 30-year member of the Bar of the State of New York, has never been the subject of any sexual harassment or discrimination charge, proceeding or lawsuit.

6.    Defendant Richards is currently employed by Bivona & Cohen as a secretary but is on paid leave. Upon information and belief, Richards resides in the Mott Haven Houses, 350 East 143rd Street, Bronx County, in the State of New York.

2

## VENUE

7.    In accordance with Rule 503(a) of the New York Civil Practice Law and Rules, venue is appropriate in this Court.

## STATEMENT OF FACTS

### I.  Richards' False Employment Application and Probationary Employment

8.    On or about August 22, 2007, Richards sought employment with Bivona & Cohen as a secretary.

9.    Richards, a single mother of three, falsified her employment application by denying that she had ever been convicted of a crime when asked to disclose any convictions. She also lied to the Firm at the time of her hiring by providing a false social security number. Richards' false statements were made to conceal the fact that she is a convicted drug felon.

10.    Unaware that Richards falsified her employment application, the Firm hired her as a probationary employee in August 2007.

11.    The Firm's recent discovery of Richards' falsification of her employment application and social security number is a legitimate business reason to terminate her employment now. Richards acknowledged when she signed the Firm's employment application that "any falsification, misrepresentation or omission, as well as any misleading statements or omissions, of the application information, attachments, and supporting documents, generally will result in denial of employment or immediate termination, if discovered after hire."

12.    From the beginning of her employment, Richards was a poor performer as she was frequently and unexpectedly absent or late, and spent excessive time on personal telephone calls during the workday. The Firm issued her disciplinary warnings. As a result of her poor work performance, and knowing she was a probationary employee who could be fired at any time, she increasingly feared for her job.

3

## II.  Richards' Unlawful Scheme

13.    Richards was aware that Figliolo, nearly twice her age, was married to a senior partner's sister.  Richards was also aware that Figliolo had a drinking problem.  Knowing that she was not performing well, Richards entered Figliolo's office in the early afternoon on a Friday, November 16, 2007 to proposition him as part of a scheme to exploit his vulnerability.

14.    Knowing that he would be receptive to the proposal of a "lap dance," Richards offered to perform a "lap dance" on Figliolo while he sat at his desk.

15.    As she performed the "lap dance," Figliolo became aroused and ejaculated inside his underwear while he was wearing his underwear and pants, using a towel to clean up.  In the weeks following the incident, Richards boasted to her co-workers that she caused Figliolo to ejaculate and showed them the soiled "trophy" towel which she had removed from Figliolo's office, and asked a co-worker "do you want to smell it?"  Richards later told the employee she had taken the towel home with her.

16.    On February 12, 2008, Brenda Diaz ("Diaz"), one of the office managers of Bivona & Cohen, asked Richards to come into her office after Richards missed a number of days of work.  At the February 12, 2008 meeting, Richards, for the first time, told the Firm that Figliolo raped her on November 16, 2007.  Later that same day, Richard's unlawful scheme was further revealed when she told another employee that she had complained today to the Firm about Figliolo and Richards offered to "throw something" of a financial nature to the other employee and thereby secure her support.

17.    Prior to February 12, 2008, Richards never complained to the Firm about the alleged rape by Figliolo, despite having received and being well aware of the Firm's written harassment prevention policies and procedures.

4

18.    On or about February 12, 2008 while at the Firm, Richards attempted to further her unlawful scheme by telling Nancy Delgado ("Delgado"), Figliolo's secretary, "Joe raped me." Richards published the aforementioned statement without Figliolo's knowledge or permission.

19.    Richards did not complain to law enforcement until February 2008 — almost three months following the "lap dance" -- nor did she seek medical attention for being raped.

20.    Richards' statement to Delgado was false, and was made with knowledge of its falsity or in reckless disregard as to its truth. Richards made her statement with malicious intent to harm Figliolo.

## III.  The Firm's Harassment Prevention Policy

21.    The Firm is an equal employment opportunity ("EEO") employer that is committed to ensuring that its workplace environs are free of all forms of discrimination and harassment. In relevant part, its harassment prevention policy and procedures provide as follows:

> Bivona & Cohen, P.C., is committed to maintaining a collegial work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere which promotes equal opportunities and prohibits discriminatory practices, including sexual harassment. At Bivona & Cohen, P.C., sexual harassment, whether verbal, physical, or arising out of the work environment, and whether in the office, at work assignments outside the office, at office sponsored social functions, or elsewhere, is unacceptable and will not be tolerated. It is also illegal. . . .
>
> An individual who believes he or she has been subjected to sexual harassment should report the incident to any member of the Firm's Sexual Harassment Committee. . . .
>
> An individual has the option of reporting the harassment to his/her supervisor. . . .

5

The current members of the Firm's Sexual Harassment Committee identified in the Firm's policy included John V. Bivona and Marlene Monteleone, both partners of the Firm Richards was familiar with.

## IV.  Defendant's Demand

22.     On or about March 26, 2008, Plaintiffs learned that they were the targets of Richards' scheme to seek millions of dollars based on her false rape allegation and false harassment claim.

23.     On March 26, 2008, Richards' attorneys sent a letter to Joan Gilbride of Kaufman Borgeest & Ryan LLP, counsel to the Firm, claiming that Richards was subject to "relentless" sexual harassment and inappropriate conduct by Figliolo from the time she started working at the Firm culminating in a rape on November 16, 2007.

24.     Richards' counsel stated in the letter that Richards is prepared to commence an action in Bronx Supreme Court against the Firm and its individual members, asserting that Richards' rights under traditional tort law and the "federal, state and local anti-discrimination rights laws" have been violated.  Richards' counsel further stated that either asking Richards to return to work from her paid leave or terminating her employment would be unlawful. Richards' counsel also stated that Plaintiffs should contact them if they have any interest in resolving this matter without resort to formal proceedings.

25.     Richards through her counsel later demanded $9 million to settle.

26.     The claimed damages are factually and legally baseless given that: (a) Richards was neither raped nor sexually harassed; (b) Richards initiated and performed the "lap dance"; (c) Richards never complained to law enforcement or to the Firm that she had been raped until almost three months after she gave Figliolo the "lap dance"; (d) she never sought medical assistance as a result of allegedly being raped; (e) she does not claim that anyone heard or

6

witnessed anything out of the ordinary during the alleged rape (or thereafter) which occurred in the middle of the day in a crowded office environment; (f) she does not allege that she suffered any adverse employment action such as a demotion or loss of pay or even threatened with an adverse action; and (g) she did not complain to the Firm about being raped, notwithstanding that the Firm maintains written harassment prevention policies and complaint procedures, until February 12, 2008 when she complained to Diaz during a meeting which was initiated by the Firm to discuss Richards' recent absences from work.

27.    Richards made this outrageous and exorbitant demand because she knew that her allegations, standing alone and completely unproven, would cause Plaintiffs to suffer ridicule, contempt and embarrassment, and would cause serious injury to their reputations and business interests. Richards' actions were calculated to instill the fear in Plaintiffs that if the $9 million were not delivered, Defendant would go public with her baseless, scandalous and scurrilous allegations and would file the lawsuit. Defendant accordingly attempted to use the threat of revealing her allegations as a means to obtain money to which she is not entitled.

28.    Following the receipt of the March 26, 2008 letter, the Firm was compelled by Defendant's threats to publicize her false claims to notify certain of its clients that Richards had stated that Figliolo raped her.

## FIRST CAUSE OF ACTION BY BOTH PLAINTIFFS
### (Declaratory Judgment)

29.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 28 of this Complaint as if fully set forth at length herein.

30.    Because of Richards' expressed intent to sue if she was not paid $9 million, including for purported claims under the "state and local anti-discrimination and human rights laws," Plaintiffs filed this lawsuit.

7

31.    Richards has unjustifiably sought $9 million from Plaintiffs under threat to make her false claims public.

32.    Richards' demands and claims are baseless under the State Human Rights Law, the City Human Rights Law or any other applicable law.

33.    Accordingly, Plaintiffs request that the Court issue a declaration pursuant to CPLR 3001 that Plaintiffs did not violate the State Human Rights law, the City Human Rights Law or any other applicable law.

## SECOND CAUSE OF ACTION BY PLAINTIFF BIVONA & COHEN
### (Declaratory Judgment)

34    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 33 of this Complaint as if fully set forth at length herein.

35.    Richards is on a paid leave of absence from the Firm.

36.    Richards' counsel has asserted that requiring Richards to return to her working duties from her paid leave or terminating her employment would be unlawful discrimination or retaliation.

37.    The Firm has recently discovered that Richards falsified her employment application and social security number.

38.    Accordingly, Plaintiff Bivona & Cohen requests that this Court issue a declaration pursuant to CPLR 3001 that any decision to discipline or terminate Richards is neither discriminatory nor retaliatory in nature, and does not violate the State Human Rights Law or any other applicable law.

## THIRD CAUSE OF ACTON BY BOTH PLAINTIFFS
### (Prima Facie Tort)

39.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 38 of this Complaint as if fully set forth at length herein.

8

40.    Richards' conduct was completely unjustified and was intended to inflict substantial harm against Plaintiffs.

41.    By reason of the foregoing, Plaintiffs are entitled to declaratory and injunctive relief as well as compensatory and punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION BY BOTH PLAINTIFFS
### (Tortious Interference With Prospective Business Relations)

42.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 41 of this Complaint as if fully set forth at length herein.

43.    By directing a letter to Joan Gilbride, counsel for Bivona & Cohen, Richards has intentionally, maliciously and without justification interfered with Figliolo's future business dealings with Bivona & Cohen by jeopardizing his career and with the Firm's future business dealings with its clients.

44.    Richards' interference with Plaintiffs' business relations was undertaken with the sole foreseeable purpose of harassing Plaintiffs and/or with dishonest, unfair or improper means.

45.    By reason of the foregoing, and as a direct and proximate result of Richards' conduct, Plaintiffs are entitled to declaratory and injunctive relief as well as compensatory and punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION AS TO FIGLIOLO
### (Defamation)

46.    Figliolo realleges paragraphs 1 through 45, as though fully set forth herein.

47.    Richards' statements of fact relating to Figliolo's alleged rape of Richards are false.

48.    Richards' statements of fact are *per se* defamatory in that they tend to injure Figliolo in his respective trade or business.

9

49.    Richards' statements of fact are *per se* defamatory in that they attribute unlawful acts to Figliolo.

50.    Richards' statements of fact were published in that they have been communicated to a third party.

51.    Richards knew that her statements of fact were false or was reckless or negligent as to the truth or falsity of her statements when she made them.

52.    Richards intentionally made the statements of fact with malice, spite and/or ill will toward Figliolo.

53.    As a consequence of the publication of Richards' false statements, Figliolo has suffered damages, and will continue to suffer damages, including but not limited to damage to his professional reputation.

54.    By reasons of the foregoing, Richards is liable to Figliolo, in an amount to be determined by the Court, together with costs and interest, as allowable by law.

## SIXTH CAUSE OF ACTION BY FIGLIOLO
### (Intentional Infliction of Emotional Distress)

55.    Plaintiff Figliolo repeats and realleges each and every allegation set forth in Paragraphs 1 through 54 of this Complaint as if fully set forth at length herein.

56.    Richards' conduct that is described in the foregoing paragraphs constitutes extreme and outrageous conduct and behavior.

57.    Richards perpetrated this conduct with malice, and with the intent to cause severe emotional distress to Figliolo and/or in deliberate disregard of the high probability that severe emotional distress to Figliolo would result.

10

58.    Richards has maliciously embarked on a course of conduct intended to cause Figliolo to suffer mental and emotional distress, tension and anxiety to induce Figliolo to pay an outrageous monetary settlement to her.

59.    Figliolo has suffered damage to his personal and business reputation and standing, has been placed under undue strain and burdens, and forced to endure extreme embarrassment.  He has suffered and will continue to suffer great mental strain and anguish and severe emotional distress.

60.    By reason of the foregoing and as a direct and proximate result of Richards' conduct, Figliolo is entitled to compensatory and punitive damages against Richards in an amount to be determined at trial.

WHEREFORE, Plaintiffs request that this Court enter a judgment in their favor and against Richards as follows:

a.    Declaring that the acts and practices complained of herein are in violation of the laws of the State of New York;

b.    Enjoining and permanently restraining these violations;

c.    Declaring that any decision to discipline or terminate Richards is neither discriminatory nor retaliatory in nature, and does not violate the State Human Rights Law, the City Human Rights Law or any other applicable law;

d.    Declaring that Plaintiffs have no liability to Richards under the State Human Rights Law, the City Human Rights Law or any other applicable law;

e.    Directing Defendant to pay compensatory and punitive damages to Plaintiffs in an amount to be proven at trial;

f.    Awarding Plaintiffs costs, disbursements and reasonable attorneys' fees; and

11

g.    Awarding Plaintiffs such other and further relief that the Court deems just and appropriate.

Dated: New York, New York
       April 18, 2008

Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.

By: _____

Ronald M. Green
Brian G. Cesaratto
Robert R. Barravecchio
250 Park Avenue
New York, New York 10177-1211
(212) 351-4500

Joan M. Gilbride
KAUFMAN BORGEEST & RYAN LLP
99 Park Avenue
New York, New York 10016

*Attorneys for Plaintiffs*

12

7188608747

APR 22,2008 16:00

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BIVONA & COHEN, P.C. and JOSEPH V. FIGLIOLO,  :  Index No. 105583/08

　　　　　　　　　　　　　　　Plaintiffs,  :  Date Purchased: 4/18/08

　　　　　　　- against -  :  Plaintiffs designate New York

WINDY RICHARDS a/k/a WENDY OGANDO,  :  County as the place of trial.

　　　　　　　　　　　　　　　　　　　:  **SUMMONS**

　　　　　　　　　　　　　Defendant.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**To the above-named Defendant:**

　　　　　YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on Plaintiffs' attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear, or answer, judgment will be taken against you by default, for the relief demanded in the Complaint.

　　　　　The basis of venue is Plaintiff Bivona & Cohen's office location, Wall Street Plaza, 88 Pine Street, New York, NY 10005. New York County, State of New York.

Dated: New York, New York
　　　　April 18, 2008

　　　　　　　　　　　　　　　　EPSTEIN BECKER & GREEN, P.C.

　　　　　　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　Ronald M. Green
　　　　　　　　　　　　　　　　Brian G. Cesaratto
　　　　　　　　　　　　　　　　Robert R. Barravecchio

250 Park Avenue
New York, New York 10177-1211
(212) 351-4500

Joan M. Gilbride
KAUFMAN BORGEEST & RYAN LLP
99 Park Avenue
New York, New York 10016

*Attorneys for Plaintiffs*

To:    Windy Richards
       350 East 143rd Street, #20A
       Bronx, New York 10454

# Exhibit 2

RICHARD D. EMERY
ANDREW G. CELLI, JR.
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
ILANN M. MAAZEL
ERIC HECKER
MARIANN MEIER WANG
SARAH NETBURN
KATHERINE ROSENFELD
O. ANDREW F. WILSON
ELIZABETH S. SAYLOR
KENNISHA A. AUSTIN
DEBBIE GREENBERGER
ELORA MUKHERJEE

**EMERY CELLI BRINCKERHOFF & ABADY LLP**

ATTORNEYS AT LAW
75 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10019

TELEPHONE
(212) 763-5000
TELECOPIER
(212) 763-5001
WEB ADDRESS
www.ecbalaw.com

March 26, 2008

**By Hand**

**Privileged & Confidential**
**For Settlement Purposes Only**

Joan Gilbride, Esq.
Kaufman Borgeest & Ryan LLP
99 Park Avenue, 19th Floor
New York, New York 10016

Re:    Windy Richards

Dear Ms. Gilbride:

This firm, together with Joseph & Herzfeld LLP, represents Windy Richards. Over the course of her employment at Bivona & Cohen PC ("Bivona & Cohen" or "the firm"), Ms. Richards, a 37 year-old single mother of three children, was subjected to a relentless, cruel, predatory, and extreme campaign of sexual harassment and inappropriate conduct by a senior partner at the firm, Joseph Figliolo. Remarkably, Bivona & Cohen did nothing to discourage or discipline Figliolo or curtail his glaring misconduct. Unchecked, Figliolo's unlawful behavior persisted and on November 16, 2007 – in an utterly astonishing episode – Figliolo sexually assaulted Ms. Richards by raping her in the office during work hours. In addition to complicity in the actual assault (by its years-long tolerance and encouragement of a sexually hostile work environment), Bivona & Cohen compounded its responsibility for this egregious set of circumstances by its clear failure to follow the most basic, lawful protocol after the rape occurred. Both Figliolo, the members of the firm and the firm itself are liable for this shocking and unusually damaging behavior.

**Windy Richards' Hiring and Sexual Harassment at Bivona & Cohen**

Windy Richards is an experienced legal secretary who has had a successful career working at a variety of New York law firms, both large and small. Hired by Bivona & Cohen in August 2007, Ms. Richards was subjected to sexual harassment and inappropriate conduct by

Joan Gilbride, Esq.
March 26, 2008
Page 2

Figliolo from the outset of her employment. Upon ending his very first meeting with Ms. Richards in her initial interview – at which Eva Tam and Damaris Pina were also present – Figliolo remarked with a smirk that he knew he was going to like having Ms. Richards at the firm because she had used the phrase "*hump* day" in referring to Wednesday (with his emphasis on the word "hump"), and that for this reason he wanted her at the firm. Although Ms. Richards was hired to work as an assistant to Eva Tam and Matthew Baron – and thus was not directly working for Figliolo – Figliolo made a point of seeking Ms. Richards out for predatory and harassing conduct. This behavior included the repeated making of lewd sexual remarks and crude, unwanted advances. Among the routine comments made by Figliolo to Ms. Richards were: "You have a terrific ass," "J.Lo's got nothing on you," "You are so hot," and "I don't think it matters what you wear, you have such a great ass, your body would make any clothes look amazing." Although in the ordinary course he could and should have obtained work files and other documents from his own secretary or from other attorneys, Figliolo began a practice of summoning Ms. Richards to his office with a pretextual request that she deliver materials to him, but as she would leave his office, he would tell her, "I really just wanted to watch you walk out of my office, so I could see that great ass of yours."

Ms. Richards was offended and disgusted by Figliolo's behavior, but faced the classic dilemma of the subordinate harassment victim fearful of challenging a powerful superior. Her ambivalence and trepidation in challenging or reporting this misconduct was exacerbated by her compelling need for work (she is the sole provider for her two daughters and one son) and by her understanding that such harassment was clearly tolerated – if not encouraged – by the culture at the firm, a fact made plain during her first interaction with Figliolo where inappropriate comments were made in front of others, with no objection or responsive discipline. In addition, Ms. Richards had been expressly told that she was on a 90-day probationary period during which she could be fired for any reason or no reason at all. Also, importantly, Ms. Richards was never told or informed, at any point, what to do if she experienced a problem at Bivona & Cohen, much less what help and procedures were available to her if she were subjected to this kind of reprehensible sexual harassment.

In contrast to Ms. Richards' vulnerability and modest status within the firm, Figliolo's power at Bivona & Cohen in general, and over Ms. Richards in particular, was open and notorious. A 60 year-old senior supervising partner with an exceptionally large corner office, Figliolo controlled much of the work at the firm and was married to a named partner's sister. Figliolo was regularly observed shouting at and intimidating junior partners and attorneys as well as assistants, telling them what to do, and had the recognized power of directing the office manager, even when such direction was contrary to normal office policy or rules.

This sexually charged and inappropriate environment and Figliolo's prominent place in it were common knowledge and persisted for many years at the firm. Discovery will adduce extensive, compelling and disturbing corroborative evidence of these working conditions. Not only did witnesses laugh and smirk at Figliolo's "hump" remark during Ms. Richards's interview, but other staff specifically recognized and noted that Figliolo had reckless sexual proclivities and a

specific sexualized interest in Ms. Richards. At least one staff member noted that although Figliolo's large corner office was all the way at the other end of the hallway, he regularly made extraordinary excursions to Ms. Richards' area and cubicle. On another occasion, when it appeared that Ms. Richards would be working for Gerald Cowen as his assistant, Figliolo was overheard loudly telling Cowen in his office: "Wait until you see your assistant – just wait till you see how she looks, and you see her ass." On a day that Ms. Richards was required to sit as Figliolo's secretary because his regular assistant was out, he was heard saying loudly into the telephone nearly all day that people should "see the assistant I have today" and that they should observe how gorgeous and attractive her body was, using an Italian expletive as he referenced her.

The demeaning remarks directed at or about Ms. Richards were only the most recent spate of widely observed remarks and conduct which made conditions at Bivona & Cohen inappropriate and intolerable. For years, Figliolo had a regular and reprehensible practice of joking about women's breasts, legs and bodies loudly in the halls, often with other partners, associates or paralegals, and of loudly discussing his sexual exploits and how all his girlfriends "left [him] broke." These conversations were regularly laced with profanity and other vulgar or crude language.

But even more disturbing and objectionable than these verbal transgressions was a long-standing and widely known practice by Figliolo of inappropriate physical contact and touching. On a regular basis, Figliolo required and forced other women in the office to massage or scratch his back. Although this physical contact was clearly unwanted and plainly inappropriate, these woman felt coerced to participate in this activity because of Figliolo's threatening and intimidating conduct. It is no wonder then, with a senior partner at the firm permissively engaging in this conduct, that another partner, Andrew Sapon, was regularly observed caressing another assistant's back and hair, without anyone telling him to stop or indicating such behavior was inappropriate.

Not surprisingly, given Figliolo's position within the firm, Ms. Richards' probationary status, her need to support her children and the fact that the firm openly condoned Figliolo's and others' offensive behavior, Ms. Richards perceived no safe, effective route for reporting or stopping Figliolo's behavior. She did her best to avoid and ignore him, and as tactfully as she perceived possible – with the overriding imperative of keeping her job – she objected to his mistreatment of her (telling him his behavior was terrible, horrible and inappropriate) and plainly stated his "interest" was unwelcome. But Figliolo remained undeterred.

## *Figliolo's Sexual Assault of Ms. Richards on November 16, 2007*

On Friday, November 16, 2007, Ms. Richards was told she had to cover for Nancy Delgado, Figliolo's regular assistant. Although she dreaded the assignment, she had no viable way of resisting it and keeping her job.

Joan Gilbride, Esq.
March 26, 2008
Page 4

On that day, sometime around 2:00 p.m., Figliolo returned from lunch. Shortly thereafter, he summoned Ms. Richards to his office. Ms. Richards responded by entering the office with mail, messages and documents for his signature. Reviewing a number of phone messages while sitting across from him, Ms. Richards's noticed that Figliolo reeked of alcohol.[1] After a brief period of reviewing phone messages, Figliolo then directed Ms. Richards to close the door to his office. Ms. Richards complied. After she closed the door and turned back around, Figliolo began a series of derogatory and lewd comments, including asking Ms. Richards if she had ever given anyone a lap dance. Offended and humiliated by the comments, Ms. Richards moved to deposit the remaining stack of documents she had brought into the office on a credenza near Figliolo's desk. Immediately after placing the documents down, Figliolo forcibly grabbed Ms. Richards by her wrists. Figliolo is an exceptionally large and — relative to Ms. Richards — powerful man. Upon grabbing her, Figliolo stated, "I want to fuck you." Then, using the force of his large body, Figliolo swung Ms. Richards around so that her upper torso was thrown down over his desk and her legs and backside were facing upward. Though she resisted and pleaded with him to stop, he was physically too strong and overpowered her. Within seconds, Figliolo had torn down Ms. Richards' stockings and forced himself on her, ejaculating eventually, including on her body and legs. When finished, he gave Ms. Richards a towel and told her to clean up.

Ms. Richards was shattered, profoundly disoriented and in a state of severe shock. It is now clear that her early childhood experience as a victim of sexual molestation impacted her emotional reaction both during and after this rape. Between the ages of 9 and 11, Ms. Richards was molested by a close relative, a fact confirmable by other available witnesses and clinical evidence.

The authenticity of Ms. Richards' account of the November 16th attack at the offices of Bovina & Cohen is indisputable. Her testimony will be exceptionally moving, and will engender powerful feelings of outrage and anger among the jury. Ms. Richards recounted the events described above at our offices during many hours of close and careful interviewing. Her injury and trauma were obvious and credible, a reality now confirmed by, among other things, follow-up investigation and the findings of an especially well-credentialed clinician with specific expertise in the area of sexual abuse.

As is common with victims of sexual assault who have a history of prior abuse, Ms. Richards reported overwhelming feelings of disassociation, paralysis, confusion, disbelief and trauma during the actual rape. By the conclusion of the assault, Ms. Richards was emotionally wrecked and weeping. Recognizing the potential consequences to himself as a result of what he had done, Figliolo desperately began attempting to reassure Ms. Richards, saying he would take care of everything for her by paying her rent, paying for vacations, and buying her things. In the same breath, he emphasized that she had to keep quiet about what had happened.

---

[1] In fact, Figliolo maintained hard liquor in his office, had it regularly delivered there, and frequently abused it during work hours. On a regular basis, and for many years, Figliolo and others drank, sometimes heavily, during the work day.

Joan Gilbride, Esq.
March 26, 2008
Page 5

After wiping the semen from her body, Ms. Richards was able to sufficiently compose herself and exit Figliolo's office. She then struggled to the women's bathroom down the hall, and immediately vomited.

### Reporting of the Rape: Bivona & Cohen's Indifference, Inaction and Retaliation

As a woman with a history of sexual abuse, Ms. Richards was conditioned to survive a sexual attack through denial and submission. And as the sole source of support for three children, her intuitive response – despite having been traumatized by the rape *at work* – was not to *leave work*. In her own mind, at least initially, leaving work meant abandoning her children by eliminating their only means of financial support. As a result, Ms. Richards made awkward, painful and ultimately ineffective efforts to return to the office. It was not easy. In the aftermath of the attack, on multiple occasions, she would weep on the subway or vomit outside on the street on her way to the office. At home, she barely slept, was plagued by nightmares, was forced to obtain prescription medication, first to help with sleep and then to control extreme anxiety, hyperventilation and panic attacks. Ms. Richards had never before been prescribed such medications. When she was awake, she suffered from depression, felt herself utterly helpless, lost, shamed and a complete failure.

Ms. Richards has since been evaluated and is now being treated by a clinician with specific expertise in helping victims of sexual abuse. She has been clinically diagnosed as suffering from, among other things, Post Traumatic Stress Disorder (PTSD). According to the clinician, all of her reactions, both during the rape and after – including her fear and reticence about reporting the attack – are entirely consistent with a woman who has been sexually assaulted and who has a history of past abuse.

Ms. Richards was raped by Figliolo on Friday, November 16th. On the following Monday, when she made her first attempt to return, she tried to confide in a person in the office who she thought would be sensitive and console her. Unfortunately, the response was dismissive and ignorant, confirming fears that the firm environment was unsafe, that reporting would be pointless, if not perilous, and that she should keep quiet.

As a result, initially, Ms. Richards attempted to soldier on and repress the experience. The emotional strain of doing so, however, was extreme. Ms. Richards continued to have nightmares, difficulty sleeping and to suffer from repeated vomiting, hyper-ventilation and panic attacks. After weeks of this, she decided to speak to Richard Cubik, a junior partner at Bivona & Cohen for whom she occasionally worked. In approximately the second week of January, she told Cubik in no uncertain terms that Figliolo had raped her in his office during work hours. Cubik's response appeared, superficially at least, to be one of shock and concern. Ultimately, however, he gave the bizarre – and unlawful – response that *Ms. Richards* had to be ready to do something about this, and that he would not do anything alone.

EMERY CELLI BRINCKERHOFF & ABADY LLP

Joan Gilbride, Esq...
March 26, 2008
Page 6

Remarkably, Cubik never again raised the issue with Ms. Richards and over the course of the next month actually appeared to avoid and shun her. Although a partner in the firm, and although he had been presented with information and evidence that another member of Bivona & Cohen had engaged in egregious — indeed, criminal conduct — Cubick apparently did nothing to address or report it. This failure and delinquency is shocking.

Meanwhile, Ms. Richards continued to unravel. Approximately, one or two weeks after telling Cubik, with no abatement in her traumatic symptoms, Ms. Richards realized that she had been sitting, staring at her computer screen not doing anything at all, feeling again depressed, helpless and lost. Almost spontaneously, she walked to Nancy Delgado's station and ultimately told her she had been raped by Figliolo. Ms. Delgado is a Pastor and also has had a substantial history with Figliolo. Ms. Delgado was supportive and understanding, telling Ms. Richards a variety of details about Figliolo which confirmed his pattern of inappropriate sexual behavior in other contexts and the firm's pattern of doing nothing.

The conversation with Ms. Delgado was important and helpful to Ms. Richards. Partly as a result of Ms. Delgado's suggestion, Ms. Richards informed Bivona & Cohen's office manager of the rape on February 12, 2008. It is our understanding that the interview between Ms. Richards and the office manager was one in which Ms. Richards displayed substantial and compelling emotion about what had occurred. Hours after this meeting, Ms. Richards was told that she was to meet with a "female counselor" with whom she would feel more comfortable talking about this subject. Although she ultimately was interviewed by you, given the initial description, Ms. Richards understood for the bulk of that meeting that you were a counselor who was there to help her, in "no way affiliated" with the firm — as opposed to a lawyer being retained by and representing Bivona & Cohen, as you plainly are. Obviously, the differences between a lawyer representing the interests of the firm and a counselor attempting to provide assistance to a victim of a sexual assault are substantial. Bivona & Cohen's possible misrepresentation in this regard raises yet another disturbing dimension to what occurred here. If, as it appears, the firm was less than candid in describing who Ms. Richards was actually speaking with on February 12, this will be yet another example of the firm's mistreatment and exploitation of Ms. Richards, a fact which will further enrage any fact-finder.

Apart from that issue, since February 12, Bivona & Cohen has only aggravated the problems that, at their root, are caused by the firm's promotion of a sexually charged and offensive atmosphere, including by allowing and encouraging a senior partner to engage in grave misconduct without any perceptible constraint or discipline.

Remarkably, while Ms. Richards was eventually allowed to go home on February 12, *the firm repeatedly instructed her to return to work or lose her job.* Such an ultimatum under these circumstances is baffling, unlawful and a clear aggravation of already horrific circumstances.

EMERY CELLI BRINCKERHOFF & ABADY LLP
Joan Gilbride, Esq.
March 26, 2008
Page 7

Notwithstanding the unreasonable nature of this demand, to avoid losing her only source of income, Ms. Richards attempted to return to Bivona & Cohen after the February 12th meeting. The reception and treatment she received was openly hostile and otherwise inappropriate. Although Ms. Richards had amicable relationships with co-workers at the firm prior to February 12, she was treated as a pariah upon her return in late February. With few exceptions, no one spoke to her at all; she was completely ostracized. The message, effectively delivered by nearly everyone at Bivona & Cohen during this period, was unequivocal: by raising the matter and trying to address it, Ms. Richards was considered the problem. Far from a questionable or irrational fear, Ms. Richards' original concerns about reporting the rape to the firm, given the culture there, turned out to be well-founded and prescient.

To this day, no one has informed Ms. Richards what, if anything, was done to Figliolo, or the results of any alleged "investigation." Although Figliolo was apparently not in the office for several weeks after February 12, 2008, you confirmed to our office via telephone that it is completely "unclear" whether Figliolo's absence was the result of his own voluntary departure, or any kind of disciplinary action taken by the firm.

In the end, the ultimate facts of this case are simple and horrific. Windy Richards was raped during work hours on firm premises by a senior partner at Bivona & Cohen. It is difficult to imagine more unconscionable, inhuman or injurious conduct. The damage and scarring of such abuse is plainly permanent and life-altering.

As you know, Ms. Richards is now being clinically treated and continues to suffer the effects of PTSD. The sex abuse experts providing this treatment have made clear what should have been obvious to any rational observer – a return to Bivona & Cohen would be deleterious to Ms. Richards health and well-being. For that reason, any move on the firm's part either to insist on Ms. Richards' returning to the firm's office to work or to terminate Ms. Richards would be unlawful. Indeed, it is our understanding that the firm has agreed to continue to keep Ms. Richards on the payroll as we determine whether her claims can be resolved. Please inform us immediately if that is not the case.

### Liability and the Legal Claims against Bivona & Cohen

We have advised Ms. Richards with respect to the range of rights and remedies she has against Bivona & Cohen. In addition to traditional tort law – *i.e.*, claims against Figliolo for sexual assault, battery, false imprisonment and intentional infliction of emotional distress, and against the individual members of Bivona & Cohen for negligence in retention, condoning, encouraging and allowing Figliolo to conduct himself as outrageously as he did – Ms. Richards has obvious claims against the firm arising out of federal, state and local anti-discrimination and human rights laws.

Those latter claims include causes of action against the firm itself, which is

Joan Gilbride, Esq.
March 26, 2008
Page 8

vicariously liable for Figliolo's horrific acts because, as a member of the firm, he is unquestionably a proxy or agent for Bivona & Cohen itself. *Faragher v. City of Boca Raton*, 524 U.S. 775, 789-90 (1998) (vicarious liability automatically applies when the harassing supervisor is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy"); *Townsend v. Benjamin*, No. 05 Civ. 9378, 2008 WL 686631 (S.D.N.Y. Mar. 13, 2008) (citing and discussing various cases explaining vicarious liability for acts of employer proxies). *See also Pugliese v. Long Island R.R. Co.*, No. 01 Civ. 7173, 2006 WL 2689600 (E.D.N.Y. Sept. 19, 2006) (holding that under New York City law, which is more expansive than federal or state law, defendant "may be held vicariously liable for the actions of [harassing employee] because, as [plaintiff's] manager, she exercised managerial or supervisory responsibility.")  Moreover, as you are no doubt aware, New York State and City's human rights laws allow for individual liability, and as such, Ms. Richards shall seek relief against both Figliolo and the individual partners and members of Bivona & Cohen who allowed and actively condoned and encouraged Figliolo's actions. *See Murphy v. ERA United Realty*, 251 A.D.2d 469, 674 N.Y.S.2d 415, 417 (2d Dep't 1998) (individuals may be liable under N.Y. Exec. Law § 296(6)); N.Y.C.§ 8-107(6); (7) (allowing for individual liability in addition to employer liability).

We are prepared to commence an action in Bronx Supreme Court immediately to address what has occurred here.  Please contact us promptly if you and your clients have any interest in resolving this without resort to formal proceedings.

Very truly yours,

Jonathan S. Abady
Mariann Meier Wang

# Exhibit 3

## Attorneys



### Ronald M. Green
**Member of the Firm**

New York, Miami
250 Park Avenue
New York, New York 10177-1211

Phone: 212/351-4646
Fax: 212/661-0989

rgreen@ebglaw.com

**RONALD M. GREEN** is a Co-Founder of Epstein Becker & Green and a Member of the Firm's Board of Directors and Executive Committee. He is resident in the New York and Miami offices and manages the firm's nationwide Labor & Employment Practice. An accomplished trial attorney of international reputation, Mr. Green represents multinational and domestic corporations, defends corporate executives and sports and entertainment luminaries, particularly in sensitive and highly publicized litigation, and advises on a wide variety of labor and employment matters.

Mr. Green pioneered the use of preemptive litigation in suing current and former employees, and others, who threaten to bring legal proceedings of an extortionate nature against the firm's clients. He also is an innovator in the use of the federal Declaratory Judgment Act to protect clients' business interests that may be at risk from disaffected employees.

Among the more than 100 cases Mr. Green has tried to conclusion were a number of significant class actions, which are rarely tried and in which complex econometric models were used with great success. He often is sought by other law firms to lead their litigation teams in cases of unusual complexity.

Mr. Green has represented prominent companies and individuals in a range of industries and businesses, including David Boies, the renowned litigator, Bill O'Reilly, the author and FOX television personality, the New York Knicks basketball organization, NBC, Morgan Stanley and the McGraw-Hill Companies. Although financial institutions and the media represent a significant portion of his clients, Mr. Green's representation spans a cross-section of industries, as well as a host of U.S. and foreign trade and business associations, including:

- The German-American Chamber of Commerce
- The International Chamber of Commerce
- The Keidanren (Japan Federation of Economic Organizations)
- The Korean Society
- The Japanese Chamber of Commerce and Industry
- The U.S. Chamber of Commerce.

A member of EBG's Hispanic Business Group, Mr. Green's affiliations with the Hispanic community are both personal and professional. His maternal family hails from Buenos Aires and remains mostly in Argentina. He has represented a number of Hispanic-owned companies and has lectured frequently in Latin America, as well as in Europe and Asia, on conducting business in the United States. Mr. Green has traveled extensively throughout all of these regions.

Building on EBG's achievement in co-founding the International Lawyers Network, which now consists of more than 85 law firms on six continents, Mr. Green led the firm's Labor & Employment Law Practice as it successfully pioneered and continues to expand the use of global affiliations with law firms that are able to provide employment-related representation for multinational companies worldwide, including firms in Argentina, Brazil, and Mexico, as well as in China, Japan and Korea, and throughout the European Union and the United Kingdom.

Prior to co-founding EBG, Mr. Green gained substantial labor regulatory expertise while working for the U.S. Department of Labor. As counsel for the Department's Office of Contract Compliance, and thereafter head of the Civil Rights Division, he helped author many of the agency's regulations. Mr. Green also played integral roles in the litigation and settlement of the landmark AT&T case and the Steel Industry Consent

Decree. Previously, Mr. Green served as a captain in the U.S. Army Judge Advocate General (JAG) Corps.

Mr. Green teaches courses in labor law and equal employment law and policy as a member of the adjunct faculty of the Cornell University School of Industrial and Labor Relations. He has been a consultant to the U.S. Secretary of Labor and the American Arbitration Association.

In addition to lecturing extensively throughout and outside the U.S., Mr. Green is a prolific author. He is co-editor of the HR Banker Newsletter, and has written and co-authored numerous articles for legal and business publications, including:

- "*Circuit City Stores v. Adams*: The End of the Long and Winding Road to a National Policy Favoring the Arbitration of Employment Disputes," The Journal of American Arbitration, Tulane Arbitration Institute, Vol. 1, No. 2 (co-author)
- "The 1992 State by State Guide to Human Resources Law," Panel Publishing (co-author)
- "Negligent Hiring, Fraud, Defamation and Other Merging Areas of Employment Liability," Bureau of National Affairs
- "New Trends And Developments in Employment Law," published by Visual Education Corp. for its Career Information Service
- Executive Guide to EEO Laws," Hill & Knowlton
- "Affected Class Relief and the Contract Compliance Program," Employee Relations Law Journal, Vol. 1, No. 3, published by Executive Enterprises
- "The Equal Employment Compliance Manual," Callaghan Law Book Company
- "Equal Employment Opportunity: Laws and Regulations Impacting on the Banking Industry," Bank Personnel Division, American Bankers Association (co-author)
- "Comparable Worth — The Compensation Issue for the 1980s?" Industrial Relations Research Association Series
- "Trends in Age Discrimination Litigation," reprinted from the Proceedings of The New York University Thirty-Fifth Annual National Conference on Labor, Matthew Bender & Company, Inc.

Mr. Green is a member of the Board of Directors and the Executive Committee of the American Jewish Congress. He also is a member of the Franklin Lodge of the Order of Free Masonry, and he is active in the alumni associations of Brooklyn Law School and The George Washington University.

Mr. Green, who is (reluctantly) retired from formula auto racing, maintains collector car museums. He also is a collector of antiquities.

Ronald Green may be contacted at (212) 351-4646, or by e-mail at rgreen@ebglaw.com.

## PRACTICE AREAS

Labor and Employment
- Class Actions — All State And Federal Discrimination Claims
- Employment Litigation
- International Employment Law
- Non-Competes, Unfair Competition and Trade Secrets
- Wage and Hour and Collective Actions

## EDUCATION

LL.M., George Washington University Law School, Labor law, 1973
J.D. , Brooklyn Law School, *honors program,* Law Review, 1968
B.S., New York University School of Commerce, 1965
Ph.D., University of Cincinnati, Pending

## BAR ADMISSIONS

New York

## COURT ADMISSIONS

New York Supreme Court
U.S. Court of Appeals for the District of Columbia Circuit
U.S. Court of Appeals for the First Circuit
U.S. Court of Appeals for the Second Circuit
U.S. Court of Appeals for the Third Circuit
U.S. Court of Appeals for the Eleventh Circuit
U.S. Court of Military Appeals
U.S. District Court, District of Columbia
U.S. District Court, Eastern District of New York
U.S. District Court, Eastern District of Wisconsin
U.S. District Court, Northern District of California
U.S. District Court, Northern District of New York
U.S. District Court, Southern District of New York
U.S. District Court, Western District of New York
U.S. Supreme Court
U.S. Tax Court

## MEMBERSHIPS

American Arbitration Association, National Panel of Labor Arbitrators
American Bar Association, Committee on Equal Employment Law and its Impact on Collective
  Bargaining

ATTORNEY ADVERTISING

Atlanta – Chicago – Houston – Los Angeles – Miami – New York – Newark – San Francisco – Stamford –
Washington, DC

**EB**Ⓖ

© 2008 Epstein Becker & Green, P.C.

# Exhibit 4




# LAW.COM

Select **'Print'** in your browser menu to print this document.

**Copyright 2008 ALM Properties, Inc. All rights reserved.**

Page printed from: http://www.law.com

Back to Article

---

### N.Y. Firm Pre-emptively Sues Secretary Who Threatened Rape Suit Against Partner

Anthony Lin
04-25-2008

A New York law firm has filed a pre-emptive suit against a secretary who it claims is demanding $9 million to drop what it says are false rape and sexual harassment charges against a partner.

In a complaint filed last Friday in Manhattan Supreme Court, Bivona & Cohen denied that partner Joseph V. Figliolo had raped the secretary, but said she had given him a consensual "lap dance" in his office.

Marlene Monteleone, a Bivona & Cohen partner, said her 38-lawyer firm, which specializes in insurance defense, had taken the step of suing first because it was being "held up" by the secretary, Windy Richards.

In its complaint, the firm says Richards and her lawyer threatened to file a suit alleging a pattern of "relentless" sexual harassment culminating in her rape by Figliolo, 59, on Nov. 17, 2007, unless Bivona & Cohen paid her $9 million.

Though such workplace claims are common, the filing of pre-emptive lawsuits against potential claimants remains a relatively rare and frequently controversial legal gambit. However, the tactic is a familiar one for the lawyer representing Bivona & Cohen.

Ronald M. Green of Epstein, Becker & Green was also the lawyer for Fox News commentator Bill O'Reilly, who in 2004 also pre-emptively sued a woman he said was preparing an "extortion" suit alleging sexual harassment. That suit was later settled under confidential terms. Bivona & Cohen is also being represented by Joan M. Gilbride of Kaufman Borgeest & Ryan.





Referring to Epstein Becker, Richards' lawyer, Jonathan S. Abady of Emery Celli Brinckerhoff & Abady, said, "This is a lawsuit brought by a firm that according to its Web site prides itself on the tactic of filing what it describes as 'preemptive' lawsuits. We look forward to this matter being resolved in a court of law." Abady declined further comment.

Philip M. Berkowitz, a partner specializing in employment law at Nixon Peabody who is not involved in the case, said such an aggressive stance most commonly arose in cases where a potential claimant is using the disclosure of highly embarrassing facts as leverage in settlement discussions. By striking first, he said, the accused hopes to remove some of the "shock value" of the allegations as well as put a different spin on them.

But Debra S. Katz, an employment plaintiffs lawyer in Washington, D.C., said pre-emptive suits never made sense

because they were "clearly retaliatory acts" in the context of harassment and discrimination claims.

"They subject the employer to more liability for retaliation," she said.

Katz also said such "thuggish" tactics, aimed at getting someone to back off a claim, usually had the opposite effect, inspiring claimants to fight harder.

Though Bivona & Cohen's complaint strongly disputes Richards' claims of rape or any unwilling conduct, its description of what unfolded at the firm hardly flatters the partner she allegedly approached. According to the complaint, Richards, 37, knew Figliolo had a drinking problem and decided to "exploit his vulnerability" in the Nov. 17 incident.

"Knowing that he would be receptive to the proposal of a 'lap dance,' Richards offered to perform a 'lap dance' on Figliolo while he sat at his desk," the complaint states. "As she performed the 'lap dance,' Figliolo became aroused and ejaculated inside his underwear while he was wearing his underwear and pants, using a towel to clean up."

Monteleone acknowledged that such conduct "would not be appropriate in any office" and said the firm had taken "appropriate remedial action" toward Figliolo. She declined to specify what actions the firm took.

In its complaint, the firm claims Richards' behavior afterward showed there was no rape.

"In the weeks following the incident," the suit claims, "Richards boasted to her co-workers that she caused Figliolo to ejaculate and showed them the soiled 'trophy' towel which she had removed from Figliolo's office."

The firm claims in its complaint that Richards, who began work as a secretary in August 2007, propositioned Figliolo, who is married to the sister of firm co-founder John Bivona, to cement her position at the firm despite her poor job performance. The complaint states she was frequently absent from work and spent much of the day talking to friends on the phone.

Indeed, the firm alleges Richards first claimed she was raped at a Feb. 12, 2008, meeting called by an office manager to discuss the secretary's work absences.

Richards subsequently retained Abady, who allegedly asked Bivona & Cohen for $9 million to settle a suit his client was prepared to file, alleging "relentless" harassment culminating in rape.

In its court papers, the firm is seeking a declaratory judgment that the secretary was not harassed and that the firm is free to fire her on the nondiscriminatory grounds that she lied on her employment application by submitting a false Social Security number to conceal that she had a prior conviction on a drug charge. Richards is currently on paid leave from the firm, according to the complaint.

According to Monteleone, the firm has determined that Richards' real name is Wendy Ogando, and she pleaded guilty in 1991 to a drug abuse charge in Ohio, for which she received a 1 1/2-year sentence. The execution of the sentence was suspended and she was put on probation.

The firm is also claiming defamation, tortious interference and intentional infliction of emotional distress.

# Exhibit 5

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | |
|---|---|
| | FEPA |
| X | EEOC |

_____ and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Windy Richards | c/o Jonathan Abady, Esq. 212 763 5000 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| c/o Jonathan Abady, Esq.; Emery Celli Brinckerhoff & Abady LLP 75 Rockefeller Plaza, 20th Floor, New York, New York 10019 | 8/14/70 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Bivona & Cohen, P.C. | 82 | 212 363 3100 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 88 Pine Street, New York, New York 10005 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(e's))

| | | |
|---|---|---|
| [X] RACE  [X] COLOR  [X] SEX  [ ] RELIGION  [ ] AGE | | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)    LATEST (ALL) August 2007 through present and ongoing. |
| [X] RETALIATION  [X] NATIONAL ORIGIN  [X] DISABILITY  [ ] OTHER (Specify) | | [X] CONTINUING ACTION |

ORIGIN

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Please see attached.

RECEIVED
MAY 0 1 2008
EEOC-NYDO-CRTIU

| | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | |
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| | SIGNATURE OF COMPLAINANT |
| 4/30/08        [signature] Date        Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) 30 April 2008 |

MARIANN WANG
Notary Public, State of New York
No. 02WA6109190
Qualified in Kings County
Commission Expires April 26, 2012

Mariann Wang

U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

------------------------------------------------x

WINDY RICHARDS,

        Claimant,                   **CHARGE**

    -against-

BIVONA & COHEN, PC,

        Respondent.

------------------------------------------------x

Windy Richards, by and through her attorneys, Emery Celli Brinckerhoff & Abady LLP, brings this claim against Bivona & Cohen, PC for discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1) and related amendments.

1. **Complainant:**   Windy Richards

          Address:   c/o Jonathan Abady
                    Emery Celli Brinckerhoff & Abady LLP
                    75 Rockefeller Plaza, 20th Floor
                    New York, New York 10019

         Telephone:  (212) 763-5000

2. **Respondents:**   Bivona & Cohen PC
                    88 Pine Street
                    New York, New York 100005
                    Tel: (212) 363-3100

3. **Description of violations**: From August 2007 to the present and ongoing, sex harassment and abuse, race, color, and gender disparate treatment and harassment, disability discrimination, perceived national origin discrimination, retaliation, and creating a hostile work environment, all as detailed below.

4. **Dates of violations**: Continually from approximately August 2007 to the present and ongoing.

## FACTS

### Background

Ms. Richards is 37 years old and a single mother of three children. She is an American citizen, although her parents were originally from the Dominican Republic. Over the course of her employment at Bivona & Cohen PC ("Bivona & Cohen" or "the firm"), Ms. Richards, was subjected to a relentless, cruel, predatory, and extreme campaign of sexual harassment and inappropriate conduct by a senior partner at the firm, Joseph Figliolo. Remarkably, during the course of her employment, Bivona & Cohen did nothing to discourage or discipline Figliolo or curtail his glaring misconduct. Unchecked, Figliolo's unlawful behavior persisted and on November 16, 2007 – in an utterly astonishing episode – Figliolo sexually assaulted Ms. Richards in the office during work hours. In addition to complicity in the actual assault – by its years-long tolerance and encouragement of a sexually hostile work environment which appears primarily to have been directed at women of color who were the support staff at the firm – Bivona & Cohen compounded and extended its responsibility for this egregious set of circumstances by first, its clear failure to follow the most basic, lawful protocol after the sexual assault occurred, and second, by retaliating directly and outrageously against Ms. Richards by suing her in court and setting forth false allegations.

### *Windy Richards' Hiring and Sexual Harassment at Bivona & Cohen*

Windy Richards is an experienced legal secretary who has had a successful career working at a variety of New York law firms, both large and small. Hired by Bivona & Cohen in August 2007, Ms. Richards was subjected to sexual harassment and inappropriate conduct by Figliolo from the outset of her employment. Upon ending his very first meeting with Ms. Richards in her initial interview – at which Bivona & Cohen employees Eva Tam and Damaris

2

Pina were also present – Figliolo remarked with a smirk that he knew he was going to like having Ms. Richards at the firm because she had used the phrase *"hump* day" in referring to Wednesday (with his emphasis on the word "hump"), and that for this reason he wanted her at the firm. Although Ms. Richards was hired to work as an assistant to Eva Tam and Matthew Baron – and thus was not directly working for Figliolo – Figliolo made a point of seeking Ms. Richards out for predatory and harassing conduct. This behavior included the repeated making of lewd sexual remarks and crude, unwanted advances. Among the routine comments made by Figliolo to Ms. Richards were: "You have a terrific ass," "J.Lo's got nothing on you," "You are so hot," and "I don't think it matters what you wear, you have such a great ass, your body would make any clothes look amazing." Although in the ordinary course he could and should have obtained work files and other documents from his own secretary or from other attorneys, Figliolo began a practice of summoning Ms. Richards to his office with a pretextual request that she deliver materials to him, but as she would leave his office, he would tell her, "I really just wanted to watch you walk out of my office, so I could see that great ass of yours."

Ms. Richards was offended and disgusted by Figliolo's behavior, but faced the classic dilemma of the subordinate harassment victim fearful of challenging a powerful superior. Her ambivalence and trepidation in challenging or reporting this misconduct was exacerbated by her compelling need for work (she is the sole provider for her two daughters and one son) and by her understanding that such harassment was clearly tolerated – if not encouraged – by the culture at the firm, a fact made plain during her first interaction with Figliolo where inappropriate comments were made in front of others, with no objection or responsive discipline. In addition, Ms. Richards had been expressly told that she was on a 90-day probationary period during which she could be fired for any reason or no reason at all. Also, importantly, Ms. Richards was never

told or informed, at any point, what to do if she experienced a problem at Bivona & Cohen, much less what help and procedures were available to her if she were subjected to this kind of reprehensible sexual harassment.

In contrast to Ms. Richards' vulnerability and modest status within the firm, Figliolo's power at Bivona & Cohen in general, and over Ms. Richards in particular, was open and notorious. A 60 year-old senior supervising partner with an exceptionally large corner office, Figliolo controlled much of the work at the firm and was married to a named partner's sister. Figliolo was regularly observed shouting at and intimidating junior partners and attorneys as well as assistants, telling them what to do, and had the recognized power of directing the office manager, even when such direction was contrary to normal office policy or rules.

This sexually charged and inappropriate environment and Figliolo's prominent place in it were common knowledge and persisted for many years at the firm. Indeed, on information and belief, Figliolo and other white men at the firm have for years directed their sexual and offensive behavior toward women within the firm, particularly at women of color who are the support staff at the firm. Not only did witnesses laugh and smirk at Figliolo's "hump" remark during Ms. Richards's interview, but other staff specifically recognized and noted that Figliolo had reckless sexual proclivities and a specific sexualized interest in Ms. Richards. At least one staff member noted that although Figliolo's large corner office was all the way at the other end of the hallway, he regularly made extraordinary excursions to Ms. Richards' area and cubicle. On another occasion, when it appeared that Ms. Richards would be working for Gerald Cowen as his assistant, Figliolo was overheard loudly telling Cowen in his office: "Wait until you see your assistant – just wait till you see how she looks, and you see her ass." On a day that Ms. Richards was required to sit as Figliolo's secretary because his regular assistant was out, he

4

was heard saying loudly into the telephone nearly all day that people should "see the assistant I have today" and that they should observe how gorgeous and attractive her body was, using an Italian expletive as he referenced her.

The demeaning remarks directed at or about Ms. Richards were only the most recent spate of widely observed remarks and conduct which made conditions at Bivona & Cohen inappropriate and intolerable. For years, Figliolo had a regular and reprehensible practice of joking about women's breasts, legs and bodies loudly in the halls, often with other partners, associates or paralegals, and of loudly discussing his sexual exploits and how all his girlfriends "left [him] broke." These conversations were regularly laced with profanity and other vulgar or crude language. Moreover, on information and belief, this reprehensible behavior and these derogatory remarks were made on a regular basis throughout the firm by other white men directed at other women, including predominantly women of color who served as support staff over the years.

But even more disturbing and objectionable than these verbal transgressions was a long-standing and widely known practice by Figliolo of inappropriate physical contact and touching. On a regular basis, Figliolo required and forced other women in the office to massage or scratch his back. Although this physical contact was clearly unwanted and plainly inappropriate, these woman felt coerced to participate in this activity because of Figliolo's threatening and intimidating conduct. It is no wonder then, with a senior partner at the firm permissively engaging in this conduct, that another partner, Andrew Sapon, was regularly observed caressing another assistant's back and hair, without anyone telling him to stop or indicating such behavior was inappropriate.

Not surprisingly, given Figliolo's position within the firm, Ms. Richards'

5

probationary status, her need to support her children and the fact that the firm openly condoned Figliolo's and others' offensive behavior, Ms. Richards perceived no safe, effective route for reporting or stopping Figliolo's behavior. She did her best to avoid and ignore him, and as tactfully as she perceived possible – with the overriding imperative of keeping her job – she objected to his mistreatment of her (telling him his behavior was terrible, horrible and inappropriate) and plainly stated his "interest" was unwelcome. But Figliolo remained undeterred.

### Figliolo's Sexual Assault of Ms. Richards on November 16, 2007

On Friday, November 16, 2007, Ms. Richards was told she had to cover for Nancy Delgado, Figliolo's regular assistant. Although she dreaded the assignment, she had no viable way of resisting it and keeping her job.

On that day, sometime around 2:00 p.m., Figliolo returned from lunch. Shortly thereafter, he summoned Ms. Richards to his office. Ms. Richards responded by entering the office with mail, messages and documents for his signature. Reviewing a number of phone messages while sitting across from him, Ms. Richards's noticed that Figliolo reeked of alcohol.[1] After a brief period of reviewing phone messages, Figliolo then directed Ms. Richards to close the door to his office. Ms. Richards complied. After she closed the door and turned back around, Figliolo began a series of derogatory and lewd comments, including asking Ms. Richards if she had ever given anyone a lap dance. Offended and humiliated by the comments, Ms. Richards moved to deposit the remaining stack of documents she had brought into the office on a credenza near Figliolo's desk. Immediately after placing the documents down, Figliolo forcibly

---

[1] In fact, Figliolo maintained hard liquor in his office, had it regularly delivered there, and frequently abused it during work hours. On a regular basis, and for many years, Figliolo and others drank, sometimes heavily, during the work day.

grabbed Ms. Richards by her wrists. Figliolo is an exceptionally large and – relative to Ms.

Richards – powerful man. Upon grabbing her, Figliolo stated, "I want to fuck you." Then, using

the force of his large body, Figliolo swung Ms. Richards around so that her upper torso was

thrown down over his desk and her legs and backside were facing upward. Though she resisted

and pleaded with him to stop, he was physically too strong and overpowered her. Within

seconds, Figliolo had torn down Ms. Richards' stockings and forced himself on her, ejaculating

eventually, including on her body and legs. When finished, he gave Ms. Richards a towel and

told her to clean up.

Ms. Richards was shattered, profoundly disoriented and in a state of severe shock. It

is now clear that her early childhood experience as a victim of sexual molestation impacted her

emotional reaction both during and after this rape. Between the ages of 9 and 11, Ms. Richards

was molested by a close relative.

As is common with victims of sexual assault who have a history of prior abuse, Ms.

Richards reported overwhelming feelings of disassociation, paralysis, confusion, disbelief and

trauma during the actual rape. By the conclusion of the assault, Ms. Richards was emotionally

wrecked and weeping. Recognizing the potential consequences to himself as a result of what he

had done, Figliolo desperately began attempting to reassure Ms. Richards, saying he would take

care of everything for her by paying her rent, paying for vacations, and buying her things. In the

same breath, he emphasized that she had to keep quiet about what had happened.

After wiping the semen from her body, Ms. Richards was able to sufficiently

compose herself and exit Figliolo's office. She then struggled to the women's bathroom down

the hall, and immediately vomited.

*Reporting of the Rape: Bivona & Cohen's Indifference, Inaction and Retaliation*

As a woman with a history of sexual abuse, Ms. Richards was conditioned to survive a sexual attack through denial and submission. And as the sole source of support for three children, her intuitive response – despite having been traumatized by the rape *at work* – was not to *leave work.* In her own mind, at least initially, leaving work meant abandoning her children by eliminating their only means of financial support. As a result, Ms. Richards made awkward, painful and ultimately ineffective efforts to return to the office. It was not easy. In the aftermath of the attack, on multiple occasions, she would weep on the subway or vomit outside on the street on her way to the office. At home, she barely slept, was plagued by nightmares, was forced to obtain prescription medication, first to help with sleep and then to control extreme anxiety, hyperventilation and panic attacks. Ms. Richards had never before been prescribed such medications. When she was awake, she suffered from depression, felt herself utterly helpless, lost, shamed and a complete failure.

Ms. Richards was raped by Figliolo on Friday, November 16th. On the following Monday, when she made her first attempt to return, she tried to confide in a person in the office who she thought would be sensitive and console her. Unfortunately, the response was dismissive and ignorant, confirming fears that the firm environment was unsafe, that reporting would be pointless, if not perilous, and that she should keep quiet.

As a result, initially, Ms. Richards attempted to soldier on and repress the experience. The emotional strain of doing so, however, was extreme. Ms. Richards continued to have nightmares, difficulty sleeping and to suffer from repeated vomiting, hyper-ventilation and panic attacks. After weeks of this, she decided to speak to Richard Cubik, a junior partner at Bivona & Cohen for whom she occasionally worked. In approximately the second week of January, she

8

told Cubik in no uncertain terms that Figliolo had raped her in his office during work hours. Cubik's response appeared, superficially at least, to be one of shock and concern. Ultimately, however, he gave the bizarre – and unlawful – response that *Ms. Richards* had to be ready to do something about this, and that he would not do anything alone.

Remarkably, Cubik never again raised the issue with Ms. Richards and over the course of the next month actually appeared to avoid and shun her. Although a partner in the firm, and although he had been presented with information and evidence that another member of Bivona & Cohen had engaged in egregious – indeed, criminal conduct – Cubick apparently did nothing to address or report it. This failure and delinquency is shocking.

Meanwhile, Ms. Richards continued to unravel. Approximately, one or two weeks after telling Cubik, with no abatement in her traumatic symptoms, Ms. Richards realized that she had been sitting, staring at her computer screen not doing anything at all, feeling again depressed, helpless and lost. Almost spontaneously, she walked to Nancy Delgado's station and ultimately told her she had been raped by Figliolo. Ms. Delgado is a Pastor and also has had a substantial history with Figliolo. Ms. Delgado was supportive and understanding, telling Ms. Richards a variety of details about Figliolo which confirmed his pattern of inappropriate sexual behavior in other contexts and the firm's pattern of doing nothing.

The conversation with Ms. Delgado was important and helpful to Ms. Richards. Partly as a result of Ms. Delgado's suggestion, Ms. Richards reported the rape to law enforcement officers and on February 12, 2008, informed Bivona & Cohen's office manager of the rape. Hours after this meeting, Ms. Richards was told that she was to meet with a "female counselor" with whom she would feel more comfortable talking about this subject. Although she ultimately was interviewed by Joan Gilbride, an outside attorney hired by the firm, given the

9

initial description, Ms. Richards understood for the bulk of that meeting that Ms. Gilbride was a counselor who was there to help her, and specifically was in "no way affiliated" with the firm – as opposed to a lawyer being retained by and representing Bivona & Cohen. Obviously, the differences between a lawyer representing the interests of the firm and a counselor attempting to provide assistance to a victim of a sexual assault are substantial. Bivona & Cohen's possible misrepresentation in this regard raises yet another disturbing dimension to what occurred here.

Worse than that, Bivona & Cohen has since the reporting chosen to retaliate against Ms. Richards and aggravated the problems that, at their root, are caused by the firm's promotion of a sexually charged and offensive atmosphere, including by allowing and encouraging a senior partner to engage in grave misconduct without any perceptible constraint or discipline. First, while Ms. Richards was eventually allowed to go home on February 12, *the firm repeatedly instructed her to return to work or lose her job*, although she was evidently suffering severely from the assault. Notwithstanding the unreasonable nature of this demand, to avoid losing her only source of income, Ms. Richards attempted to return to Bivona & Cohen after the February 12th meeting. The reception and treatment she received was openly hostile and otherwise inappropriate. Although Ms. Richards had amicable relationships with co-workers at the firm prior to February 12, she was treated as a pariah upon her return in late February. With few exceptions, no one spoke to her at all; she was completely ostracized. The message, effectively delivered by nearly everyone at Bivona & Cohen during this period, was unequivocal: by raising the matter and trying to address it, Ms. Richards was considered the problem. Far from a questionable or irrational fear, Ms. Richards' original concerns about reporting the rape to the firm, given the culture there, turned out to be well-founded and prescient.

Most outrageous of all, Bivona & Cohen has since *sued Ms. Richards* in a blatant and

public retaliation against her for reporting the abusive and unlawful conduct that occurred at the firm. The firm has sued Ms. Richards for frivolous claims such as "prima facie tort" and "interference with business relations" based on its false allegations that Ms. Richards is extorting the firm and lied on her employment application.

### Liability and the Legal Claims against Bivona & Cohen

The firm is vicariously liable for Figliolo's horrific acts because, as a member of the firm, he is unquestionably a proxy or agent for Bivona & Cohen itself. *Faragher v. City of Boca Raton*, 524 U.S. 775, 789-90 (1998) (vicarious liability automatically applies when the harassing supervisor is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy"); *Townsend v. Benjamin*, No. 05 Civ. 9378, 2008 WL 686631 (S.D.N.Y. Mar. 13, 2008) (citing and discussing various cases explaining vicarious liability for acts of employer proxies).

The harassment and abuse of Ms. Richards has caused and will continue to cause her substantial harm. She suffered throughout her presence at the firm, and continues to suffer through the memories of the abusive behavior and now from the ongoing retaliatory acts by the firm against her. The shock of her treatment has caused her untold emotional distress.

Dated: April 30, 2008
       New York, New York

By: _____
    Windy Richards, Complainant

Sworn to before me this 30
day of April, 2008

_____
Notary Public

MARIANN WANG
Notary Public, State of New York
No. 02WA6109190
Qualified in Kings County
Commission Expires April 26, 2002

EMERY CELLI BRINCKERHOFF & ABADY LLP

By: _____
    Jonathan Abady

    75 Rockefeller Plaza, 20th Floor
    New York, N.Y. 10019
    (212) 763-5000

    Attorneys for Complainant W. Richards

# Exhibit 6

EEOC Form 161-B (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To: Windy Richards
C/O Jonathan Abady, Esq. - Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019

From: New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2008-03241 | John B. Douglass, Supervisory Investigator | (212) 336-3765 |

(See also the additional information enclosed with this form.)

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐ The EEOC is terminating its processing of this charge.

☒ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Spencer H. Lewis, Jr.,
Director

5/9/2008
(Date Mailed)

Enclosures(s)

cc: BIVONA & COHEN
Human Resources Director
88 Pine Street
New York, NY 10005

# Exhibit 7

C O P Y

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
WINDY RICHARDS,

        Plaintiff,

    v.

BIVONA & COHEN PC, JOSEPH
FIGLIOLO, JOHN BIVONA, RODERICK
COYNE, JAN MICHAEL RYFKOGEL,
ANDREW SAPON, ROBERT MACCHIA,
RICHARD KUBIK, MARLENE
MONTELEONE, and JOHN/JANE DOES 1-
10,

        Defendants.
-------------------------------------------------------x

**COMPLAINT**

'08 CIV 4453

Jury Trial Demanded

Docket No. _____



Plaintiff, Windy Richards, alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This is a shocking case involving the sexual assault of a female

legal secretary by a senior partner at a New York City law firm. It also includes an

extraordinary campaign of retaliation by the firm against the victim after she reported the

incident.

2.      Windy Richards is a 37 year old, single mother of three children

who began working as a legal secretary at Bivona & Cohen, PC ("Bivona & Cohen" or

"the Firm") in August 2007. Over the course of her employment at Bivona & Cohen,

Ms. Richards was subjected to a relentless, cruel, predatory, and extreme campaign of

sexual harassment and inappropriate conduct by a senior partner at the firm, Joseph

Figliolo. Remarkably, the Firm and those who controlled its affairs did nothing to discourage or discipline Figliolo or curtail his glaring misconduct. In fact, Figliolo's abusive conduct had been evident for years at the Firm and was widely known among those who worked there. Rather than rein him in or discourage him in any way, many of Figliolo's fellow partners participated in his sexually demeaning and degrading remarks and behavior. Unchecked and effectively ratified by the Firm, Figliolo's unlawful behavior persisted and on or about November 16, 2007 – in an astonishing episode – Figliolo raped Ms. Richards in his office during work hours.

3.        In addition to complicity in the actual assault – by its years-long tolerance and encouragement of a sexually hostile work environment – Bivona & Cohen and its coterie of partners compounded and extended their responsibility for this egregious set of circumstances by their wholesale failure to follow the most basic, lawful protocol after the sexual assault occurred. Then, in a remarkable act of retaliation, after Ms. Richards complained of the assault and retained counsel to represent her, the Firm *sued her* in state court, basing its suit on fabrications and a host of frivolous legal claims.

4.        The law firm hired to represent Bivona & Cohen, Epstein Becker & Green, P.C. ("Epstein Becker"), boasts on its website that it has pioneered the use of "preemptive litigation" as a tactic to defend employers in employment discrimination lawsuits. In this case, Epstein Becker filed its "preemptive" suit against Ms. Richards *with a press release.* This tabloid approach has only exacerbated Ms. Richards' injury by subjecting her to further embarrassment, humiliation and intimidation. She now brings this federal action to vindicate her rights and seek redress for the horrific wrongs committed against her.

2

## PARTIES, JURISDICTION AND VENUE

5.         At all times relevant hereto, Plaintiff Windy Richards has been employed by Bivona & Cohen as a legal secretary, and resides in Bronx, New York.

6.         At all times relevant hereto, Bivona & Cohen PC was a law firm with offices at 88 Pine Street, New York, New York 10005, employing over 100 individuals, including approximately 60 attorneys.

7.         At all times relevant hereto, Defendant Joseph Figliolo has been a senior partner at Bivona & Cohen. Defendant Figliolo has long engaged in abusive, harassing and discriminatory behavior toward staff at the Firm, including without limitation, sexual harassment of predominantly women of color who serve as staff at the Firm.

8.         At all times relevant hereto, Defendant John Bivona has been a senior partner at Bivona & Cohen and has participated in the sexual harassment, degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

9.         At all times relevant hereto, Defendant Roderick Coyne has been a partner at Bivona & Cohen and has participated in the sexual harassment, degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

10.         At all times relevant hereto, Defendant Jan Michael Ryfkogel has been a partner at Bivona & Cohen and has participated in the sexual harassment,

3

degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

11.        At all times relevant hereto, Defendant Andrew Sapon has been a partner at Bivona & Cohen and has participated in the sexual harassment, degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

12.        At all times relevant hereto, Defendant Robert Macchia has been a partner at Bivona & Cohen and has participated in the sexual harassment, degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

13.        At all times relevant hereto, Defendant Richard Kubik has been a partner at Bivona & Cohen and has participated in the sexual harassment, degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

14.        At all times relevant hereto, Defendant Marlene Monteleone has been a partner at Bivona & Cohen and has participated in the sexual harassment, degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

4

15.       At all times relevant hereto, Defendants John/Jane Doe 1-10 are individuals at Bivona & Cohen who have participated in the sexual harassment, degradation, discrimination and/or retaliation of women at the Firm and/or knew or should have known of the harassing, abusive, discriminatory and/or retaliatory environment at the Firm, and took no corrective action.

16.       Jurisdiction of this Court is proper under 28 U.S.C. § 1331, Title VII, 42 U.S.C. § 2000e-5(f)(3), and 42 U.S.C. § 1981. The Court additionally has supplemental jurisdiction over state and city law claims pursuant to 28 U.S.C. § 1367.

17.       As the Southern District is the district where a substantial part of the events giving rise to the claims occurred, venue is proper within this District pursuant to 28 U.S.C. § 1391(a)(2). Pursuant to Section 8-502(c) of the City Law, Plaintiff will serve a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

18.       Plaintiff filed a charge with the United States Equal Opportunity Employment Commission ("EEOC") against Bivona & Cohen on or about May 1, 2008, complaining of the acts of sexual harassment and assault, sex, race, color, ethnic, national origin and disability discrimination, and retaliation alleged herein. On or about May 9, 2008, the EEOC issued Plaintiff a notice of right to sue. Plaintiff has fully complied with the administrative prerequisites of Title VII.

## **FACTUAL ALLEGATIONS**

### *Background*

19.       Plaintiff is 37 years old and a single mother of three children. Although a United States Citizen, Ms. Richards' parents are from the Dominican

5

Republic. She is an experienced legal secretary who has worked at a variety of New York law firms, both large and small.

20.        In late August 2007, Ms. Richards was hired as a legal secretary by Bivona & Cohen. From the outset of her employment, Ms. Richards was subjected to sexual harassment and inappropriate conduct by Figliolo. Indeed, at the conclusion of Ms. Richards' initial interview, Figliolo remarked with a smirk that he knew he was going to like having Ms. Richards at the Firm because she had used the phrase "hump day" in referring to Wednesday (with his emphasis on the word "hump").

21.        Although Ms. Richards was hired to work as an assistant to Eva Tam and Matthew Baron of the Firm – and thus was not directly working for Figliolo – Figliolo made a point of seeking out Ms. Richards and engaging in predatory and harassing conduct. Figliolo repeatedly made lewd sexual remarks and crude, unwanted advances toward Ms. Richards. Typical of the lewd statements Figliolo made to Ms. Richards were: "You have a terrific ass," "J.Lo's got nothing on you," "You are so hot," and "I don't think it matters what you wear, you have such a great ass, your body would make any clothes look amazing."

22.        Because Ms. Richards was not hired to assist him, Figliolo ordinarily should have obtained work files and other documents from his own secretary or from other attorneys. Soon after her employment started, however, Figliolo began a practice of summoning Ms. Richards to his office with a pretextual request that she deliver materials to him. As she would leave his office, he would tell her, "I really just wanted to watch you walk out of my office, so I could see that great ass of yours."

23.        Ms. Richards was offended and disgusted by Figliolo's behavior,

6

but faced the classic dilemma of the subordinate harassment victim fearful of challenging a powerful superior. Her trepidation in challenging or reporting this misconduct was exacerbated by her compelling need for work (she is the sole provider for her three children) and by her understanding that such harassment was tolerated – and even appeared to be encouraged – by the culture at the Firm, a fact made plain during her first interaction with Figliolo where inappropriate comments were made in front of others, with no objection or responsive discipline.

24.     In addition, Ms. Richards had been told that she was on a 90-day probationary period during which she could be fired for any reason or no reason at all. Nor was Ms. Richards told what to do if she experienced a problem at Bivona & Cohen, much less what help and procedures were available to her if she were subjected to this kind of reprehensible sexual harassment.

25.     In contrast to Ms. Richards' vulnerable and subordinate status within the firm, Figliolo's power at Bivona & Cohen in general, and over Ms. Richards in particular, was open and notorious. A 60 year-old senior supervising partner with an exceptionally large corner office, Figliolo appeared to control much of the work at the firm and is married to a named partner's sister. Figliolo was regularly observed shouting at and intimidating junior partners and attorneys as well as assistants. He ordered everyone about, and had the recognized power of directing the office manager, even when such direction was contrary to normal office policy or rules.

26.     This sexually charged and inappropriate environment and Figliolo's prominent place in it were common knowledge and had persisted for many years at the firm. Not only did witnesses laugh and smirk at Figliolo's "hump" remark

7

during Ms. Richards's interview, but other staff specifically recognized and noted that Figliolo had reckless sexual proclivities and a specific sexualized interest in Ms. Richards. At least one staff member noted that although Figliolo's large corner office was all the way at the other end of the hallway, he regularly made extraordinary excursions to Ms. Richards' area and cubicle.

27.        On another occasion, when it appeared that Ms. Richards would be working for a different Bivona & Cohen associate, Gerald Cowen, as his assistant, Figliolo was overheard loudly telling Cowen in his office: "Wait until you see your assistant – just wait till you see how she looks, and you see her ass."

28.        On a day that Ms. Richards was required to sit as Figliolo's secretary because his regular assistant was out, he was heard saying loudly into the telephone nearly all day that people should "see the assistant I have today" and that they should observe how gorgeous and attractive her body was, using an Italian expletive as he referenced her.

29.        The demeaning remarks directed at or about Ms. Richards were only the most recent spate of widely observed remarks and conduct which made conditions at Bivona & Cohen inappropriate and intolerable. For years, Figliolo had a regular and reprehensible practice of joking about women's breasts, legs and bodies loudly in the halls, often with other partners, associates or paralegals, and of loudly discussing his sexual exploits.

30.        In particular, Figliolo was frequently observed to have engaged in these loud, demeaning and harassing conversations with, at a minimum, John Bivona, Roderick Coyne, Jan Michael Ryfkogel, Andrew Sapon and/or Robert Macchia. These

8

conversations were regularly laced with profanity and other vulgar or crude language.

31.        More disturbing and objectionable than these verbal transgressions was a long-standing and widely known practice by Figliolo of inappropriate physical contact and touching. On a regular basis, Figliolo required and forced women in the office to massage or scratch his back. Although this physical contact was clearly unwanted and plainly inappropriate, the woman felt coerced to participate in this activity because of Figliolo's status at the firm and his threatening and intimidating demeanor.

32.        Not surprisingly, Figliolo was not the only partner at the firm engaging in this behavior. Another partner, Andrew Sapon, was regularly observed caressing another assistant's back and hair, without anyone telling him to stop or indicating such behavior was inappropriate. In the past, other partners were also observed engaging in this kind of unlawful contact as well.

33.        On information and belief, the remarks, harassment and abuse were most commonly directed at or towards the female support staff at the New York office, who were overwhelmingly women of color, often Hispanic or African American. On information and belief, Bivona & Cohen and its member partners, in particular, Joseph Figliolo, John Bivona, Roderick Coyne, Jan Michael Ryfkogel, Andrew Sapon, Robert Macchia, Richard Kubik, Marlene Monteleone, and John/Jane Doe 1-10 all participated in, knew, and/or should have known of the harassing, discriminatory and abusive environment at the Firm, but failed to take corrective action. In addition, on information and belief, other complaints of misconduct, sexual harassment, discrimination and retaliation have been made, but defendants failed to take appropriate and/or sufficient corrective action.

9

34.          Given Figliolo's position within the firm, Ms. Richards'
probationary status, her need to support her children and the fact that the firm openly
condoned Mr. Figliolo's and others' offensive behavior, Ms. Richards perceived no safe,
effective route for reporting or stopping Figliolo. She did her best to avoid and ignore
him, and as tactfully as she perceived possible – with the overriding imperative of
keeping her job – she objected to his mistreatment of her (telling him his behavior was
terrible, horrible and inappropriate). But Figliolo was immune to the objections, did not
take them seriously and remained undeterred.

### Figliolo's Sexual Assault of Ms. Richards

35.          On Friday, November 16, 2007, Ms. Richards was told she had to
cover for Figliolo's regular assistant. Although she dreaded the assignment, she had no
viable way of resisting it and keeping her job.

36.          On that day, sometime around 2:00 p.m., Figliolo returned from
lunch. He was inebriated and reeking of alcohol. In fact, Figliolo maintained hard liquor
in his office, had it regularly delivered there, and frequently abused it during work hours.
On a regular basis, and for many years, Figliolo and others drank, sometimes heavily,
during the work day.

37.          Shortly thereafter, he summoned Ms. Richards to his office. Ms.
Richards responded by entering the office with mail, messages and documents for his
signature. Sitting across the desk from Figliolo, Ms. Richards observed that he reeked of
alcohol and was intoxicated. After a brief period, Figliolo directed Ms. Richards to close
the door to his office. Ms. Richards complied. After she closed the door and turned back
around, Figliolo began a series of derogatory and lewd comments, including asking Ms.

10

Richards if she had ever given anyone a lap dance.

38.        Although disturbed by his remarks, in Ms. Richards' experience, it was not out of the ordinary for Mr. Figliolo to behave that way. She tried to ignore him and walked over to deposit a stack of documents she had brought into the office on a credenza near Figliolo's desk. Ms. Richards was completely unprepared for Figliolo's becoming physically violent. Immediately after placing the documents down, however, Figliolo forcibly grabbed Ms. Richards by her wrists. Figliolo is an exceptionally large and – relative to Ms. Richards – powerful man.

39.        Figliolo grabbed Ms. Richards and stated, "I want to fuck you." Then, using the force of his body, he swung Ms. Richards around so that her upper torso was thrown down over his desk and her legs and backside were facing him. Though she resisted and pleaded with him to stop, he was physically too strong and overpowered her. Within seconds, Figliolo had torn down Ms. Richards' stockings and forced himself on her, ejaculating eventually, including on her body and legs. When finished, he gave Ms. Richards a towel and told her to clean up.

40.        At the conclusion of Figliolo's violent sexual assault, Ms. Richards was shattered, profoundly disoriented and in a state of severe shock. She was emotionally wrecked and weeping. Recognizing what he had done, Figliolo desperately began attempting to reassure Ms. Richards, saying he would take care of everything for her by paying her rent, paying for vacations, and buying her things. In the same breath, he emphasized that she had to keep quiet about what had happened.

41.        After wiping the semen from her body, Ms. Richards was able to sufficiently compose herself and exit Figliolo's office. She then struggled to the

11

women's bathroom down the hall, and immediately vomited.

### Reporting of the Rape: Bivona & Cohen's Indifference, Inaction and Public Retaliation

42.          As the sole source of support for three children, Ms. Richard's intuitive response – despite having been traumatized by the rape *at work* – was not to lose her job. In her own mind, at least initially, leaving work meant abandoning her children by eliminating their only means of financial support. As a result, Ms. Richards made awkward, painful and ultimately ineffective efforts to return to the office. It was not easy. In the aftermath of the attack, on multiple occasions, she would weep on the subway or vomit outside on the street on her way to the office. At home, she barely slept, was plagued by nightmares, was forced to obtain prescription medication, first to help with sleep and then to control extreme anxiety, hyperventilation and panic attacks. When she was awake, she suffered from depression, felt herself utterly helpless, lost, shamed and a complete failure.

43.          On the Monday following the rape, Ms. Richards tried to confide in a person in the office who she thought would be sensitive and console her. Unfortunately, the response was dismissive and ignorant, confirming fears that the firm environment was unsafe, that reporting would be pointless, if not perilous, and that she should keep quiet.

44.          Ms. Richards believed there was nothing she could do about the rape. As a result, she attempted to soldier on and repress the experience, thus retaining her sole source of income. The emotional strain of doing so, however, was extreme. Ms. Richards continued to have nightmares, difficulty sleeping and suffered from repeated vomiting, hyper-ventilation and panic attacks. After weeks of this, she decided to speak

12

to Richard Kubik, a junior partner at Bivona & Cohen for whom she occasionally worked.

45.    In approximately the second week of January 2008, she told Kubik that Figliolo had raped her in his office during work hours. Kubik's response appeared, superficially at least, to be one of shock and concern. Ultimately, however, he told Ms. Richards that *she* had to be ready to do something about this, and that he would not do anything alone because it was such a sensitive matter.

46.    After brusquely dropping the ball and essentially conveying to Ms. Richards that she was on her own, Kubik never again raised the issue with Ms. Richards and over the course of the next month actually appeared to avoid and shun her.

47.    Despite the fact that he is a partner at the Firm and had been presented with information and evidence that one of his partners had engaged in egregious criminal conduct, Kubik apparently did nothing to address or report it.

48.    Meanwhile, Ms. Richards continued to unravel. Approximately two weeks after her futile attempt to get help from Kubik, Ms. Richards realized that she had been sitting, staring at her computer screen not doing anything at all, feeling depressed, helpless and lost. Knowing that she could not go on like that any longer, she got up from her station and told Figliolo's assistant that she had been raped by Figliolo. The assistant was supportive and understanding, telling Ms. Richards a variety of details about Figliolo which confirmed his pattern of inappropriate behavior in other contexts and the Firm's pattern of doing nothing.

49.    That conversation was important and helpful to Ms. Richards. Partly as a result of it, Ms. Richards informed Bivona & Cohen's office manager of the

rape on February 12, 2008. Ms. Richards was very emotional during the interview with the office manager.

50.    After this meeting, Ms. Richards was told that she was going to meet with a "female counselor." Ms. Richards then met with Joan Gilbride, a lawyer from Kaufman Borgeest & Ryan LLP. Ms. Richards believed that Gilbride was there to help her and was in "no way affiliated" with the Firm, and was again very emotional. In reality, Ms. Gilbride was an attorney who had been retained as outside counsel to represent Bivona & Cohen.

51.    After Ms. Richards met with both the office manager and the Firm's attorney, she was eventually allowed to go home on February 12.

52.    Upon information and belief, the Firm allowed her to go home because of her demonstrably fragile and compromised mental health and her apparent inability to work given her condition. Nonetheless, thereafter, *the firm repeatedly instructed Ms. Richards to return to work (where she had been raped) or risk loosing her job.*

53.    Notwithstanding the unreasonable nature of this demand, to avoid losing her only source of income, Ms. Richards attempted to return to Bivona & Cohen after the February 12th meeting. The reception and treatment she received was openly hostile and otherwise inappropriate.

54.    Although Ms. Richards previously had had amicable relationships with co-workers at the Firm, she was treated as a pariah upon her return. With few exceptions, no one spoke to her at all; she was completely ostracized. The message, effectively delivered by nearly everyone at Bivona & Cohen during this period, was

14

unequivocal: by raising the matter and trying to address it, Ms. Richards was considered the problem. Far from a questionable or irrational fear, Ms. Richards' original concerns about reporting the rape to the Firm, given the culture there, turned out to be well-founded and prescient.

55.        On information and belief, the Firm has done nothing to discipline or reprimand Figliolo.

56.        Whether or not Ms. Richards' claims have been fully and properly investigated is also unclear.

57.        In fact, rather than take appropriate corrective action, Bivona & Cohen and those who control its affairs, have since *sued Ms. Richards* in a blatant and public retaliation against her for reporting the abusive and unlawful conduct that occurred at the Firm.

58.        The Firm has sued Ms. Richards in state court for such frivolous claims as "prima facie tort" and "interference with business relations." The charges and suit are based on the false allegations that Ms. Richards is extorting the firm.

59.        Ostensibly unsatisfied with a regular filing of this preemptive and retaliatory lawsuit, the Firm and its various members chose to issue a press release with their frivolous complaint, broadcasting to the world their unfounded claims against Ms. Richards.

60.        In addition, on information and belief, defendants have hired an individual or individuals who are aggressively taking actions to intimidate Ms. Richards by following her, disparaging her to friends and neighbors, and otherwise attempting to frighten her. On information and belief, such individual or individuals are undertaking

15

such acts at the specific direction of defendants.

61.         The harassment and abuse of Ms. Richards has caused and will continue to cause her significant harm. She suffered throughout her presence at the Firm, and continues to suffer through the memories of the abusive behavior and now from the ongoing retaliatory acts by the Firm against her.

## FIRST CAUSE OF ACTION

Unlawful Discrimination - Title VII, 42 U.S.C. § 2000e *et seq.*
Against Defendant Bivona & Cohen PC

62.         Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

63.         Bivona & Cohen is an employer as defined in Title VII, and at all relevant times herein, employed Ms. Richards.

64.         At all relevant times herein, defendant Bivona & Cohen discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex, race, color, and/or perceived national origin in violation of Title VII, including without limitation by allowing for, encouraging and condoning: a sexually hostile, demeaning, degrading and abusive work environment; the disparate treatment, discrimination and degradation of female staff who are predominantly women of color; and/or other acts as detailed above.

65.         As a result of Bivona & Cohen's sexual harassment and discrimination against Ms. Richards, Plaintiff has been damaged and is entitled to compensatory damages, plus costs and attorneys' fees, and is further entitled to punitive damages.

16

## SECOND CAUSE OF ACTION
Unlawful Retaliation – Title VII, 42 U.S.C. § 2000e *et seq.*
Against Defendant Bivona & Cohen PC

66.        Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

67.        When Ms. Richards reported to Bivona & Cohen that Figliolo had raped her, and otherwise recounted and reported her hostile work environment, she was subjected to retaliation and further abuse, all of which adversely and severely impacted her position, career and well-being, and was designed to punish and retaliate against her for having complained about the humiliating and frightening treatment she was forced to endure.

68.        As a result of Defendants' unlawful retaliation against Plaintiff, Plaintiff has been damaged and is entitled to compensatory damages, plus costs and attorneys' fees, and is further entitled to punitive damages.   In particular, Defendants engaged in the subject retaliatory conduct with malice and reckless indifference to Plaintiff's federally protected rights, and such conduct, demonstrates reprehensible motives and such wanton dishonesty as to imply a criminal indifference to civil obligations.

## THIRD CAUSE OF ACTION
42 U.S.C. § 1981

69.        Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

70.        At all relevant times herein, defendants intentionally discriminated against Plaintiff in the terms and conditions of her employment on the basis of her race, including without limitation by allowing for, encouraging and condoning: a sexually

17

hostile, demeaning, degrading and abusive work environment targeted at her because of her race; the differential treatment, discrimination and degradation of Ms. Richards and other female staff who are predominantly women of color; and/or other acts as detailed above.

71.        As a result of Defendants' discrimination of Ms. Richards, Plaintiff has been damaged and is entitled to compensatory damages, plus costs and attorneys' fees, and is further entitled to punitive damages.

## FOURTH CAUSE OF ACTION
42 U.S.C. § 1985

72.        Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

73.        At all relevant times herein, individual defendants agreed and conspired together to deter, by force, intimidation, or threat, Ms. Richards from pursuing and/or enforcing her civil rights in court and/or testifying truthfully to the racially discriminatory behavior of defendants, and/or agreed and conspired for the purpose of impeding, hindering, obstructing, or defeating the due course of justice, with intent to deny Ms. Richards the equal protection of the laws, including without limitation by retaliating against Ms. Richards through a publicized, baseless lawsuit founded on false and frivolous claims, by threatening her termination, and by directing and/or directly intimidating Ms. Richards.

74.        As a result of Defendants' conspiracy, Plaintiff has been damaged and is entitled to compensatory damages, plus costs and attorneys' fees, and is further entitled to punitive damages.

### FIFTH CAUSE OF ACTION
Unlawful Discrimination and Retaliation – Americans With Disability Act
Against Defendant Bivona & Cohen PC

75.        Plaintiff repeats and realleges the above paragraphs as if fully set

forth herein.

76.        Bivona & Cohen is an employer as defined in the Americans With

Disability Act ("ADA"), and at all relevant times herein, employed Ms. Richards.

77.        At all relevant times herein, defendant Bivona & Cohen

discriminated and retaliated against Plaintiff in the terms and conditions of her

employment on the basis of her disability in violation of the ADA, including without

limitation by requiring Ms. Richards immediately to return to work despite her mental

health status and the obviously severe, detrimental effects that a return to work would

have on her mental health.

78.        As a result of Bivona & Cohen's discrimination and retaliation

against Ms. Richards on the basis of disability, Plaintiff has been damaged and is entitled

to compensatory damages, plus costs and attorneys' fees, and is further entitled to

punitive damages. and/or

### SIXTH CAUSE OF ACTION
Unlawful Discrimination and Retaliation - New York Executive Law
Against All Defendants

79.        Plaintiff repeats and realleges the foregoing allegations.

80.        The foregoing acts and practices of defendants constitute unlawful

discriminatory and retaliatory employment practices within the meaning of and in

violation of Section 296 of the New York State Executive Law.

81.        As a result of Defendants' sexual harassment and sex, race, color,

19

perceived national origin, and/or disability discrimination and retaliation against Plaintiff, she has been damaged and is entitled to compensatory damages.

## SEVENTH CAUSE OF ACTION
Unlawful Discrimination and Retaliation - New York City Administrative Code
Against All Defendants

82.     Plaintiff repeats and realleges the foregoing allegations.

83.     The foregoing acts and practices of defendants constitute unlawful discriminatory and retaliatory employment practices within the meaning of and in violation of Section 8-107(1)(a) of Title 8 of the New York Administrative Code.

84.     As a result of Defendants' sexual harassment and sex, race, color, perceived national origin, and/or disability discrimination and retaliation against Plaintiff, she has been damaged and is entitled to compensatory damages, punitive damages and attorneys fees and costs.

## EIGHTH CAUSE OF ACTION
Intentional Infliction of Emotional Distress

85.     Plaintiff repeats and realleges the foregoing allegations.

86.     Defendants' actions complained of herein constitute extreme and outrageous conduct directed at plaintiff undertaken with the intent to cause plaintiff to suffer severe emotional distress or otherwise undertaken in reckless disregard of the substantial probability that such extreme and outrageous conduct would cause plaintiff to suffer severe emotional distress.

87.     Defendants' conduct as complained of herein is so outrageous in character and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

88.     As a direct and proximate result of defendants' extreme and

outrageous conduct complained of herein, plaintiff has suffered extreme emotional distress.

89.        As a result of Defendants' sexual harassment and discrimination against Plaintiff, Plaintiff has been damaged and is entitled to compensatory and punitive damages and attorneys fees and costs.

## NINTH CAUSE OF ACTION
Assault and Battery - against Figliolo

90.        Plaintiff repeats and realleges the foregoing allegations.

91.        Figliolo's rape of Plaintiff constitutes an assault and battery.

92.        As a result of the foregoing actions of Figliolo, Plaintiff has been damaged and is entitled to compensatory and punitive damages.

## TENTH CAUSE OF ACTION
Negligence - against Bivona & Cohen, Defendants John Bivona, Roderick Coyne, Jan Michael Ryfkogel, Andrew Sapon, Robert Macchia, Richard Kubik, Marlene Monteleone, and John/Jane Doe 1-10 (collectively, "Negligence Defendants")

93.        Plaintiff repeats and realleges the foregoing allegations.

94.        The Negligence Defendants knew or reasonably should have known of Figliolo's behavior, including without limitation his long history of abusive and harassing conduct towards staff members, including without limitation toward support staff and Ms. Richards in particular, and/or his long history of alcohol abuse at the office.

95.        The Negligence Defendants knew or reasonably should have known of that Figliolo would assault Ms. Richards, but did nothing to prevent his assault of her, including without limitation by continuing to retain and failing to terminate Figliolo and by failing to take any other reasonable measures to prevent his assault of her.

As a result of the foregoing actions of Negligence Defendants, Plaintiff

has been damaged and is entitled to compensatory and punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment and order:

a.      Enjoining defendants from further discriminatory and retaliatory conduct directed towards Plaintiff;

b.      Awarding compensatory damages for all economic loss, including, but not limited to, back pay, front pay, bonuses, incentive pay, pension benefits, expense reimbursement and all other benefits to which Plaintiff is entitled;

c.      Awarding compensatory damages for all other economic loss, physical and emotional distress, anxiety, humiliation, injury to reputation, emotional harm, pain and suffering, career, family and social disruption and other grievous harm;

d.      Awarding punitive damages;

e.      Awarding costs and disbursements of this suit, including reasonable attorney's fees;

f.      Awarding pre-judgment interest;

g.      Awarding such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all matters triable by a jury.

Respectfully submitted,

Dated: May 12, 2008
        New York, New York

By: _Jonathan S Abady_____
        Jonathan S. Abady (JA 5147)
        Mariann Wang (MW 7417)

EMERY CELLI BRINCKERHOFF & ABADY LLP
75 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10019
(212) 763-5000
(212) 763-5001 (FAX)

JOSEPH & HERZFELD LLP
757 THIRD AVENUE
25TH FLOOR
NEW YORK, NY 10017
(212) 688-5640
(212) 688-2548 (fax)

*Attorneys for Plaintiff*